· **FLEET NATIONAL BANK and Cooperatieve Centrale Raiffeisen–Boerenleenbank B.A., Plaintiffs,**

v.

**TONNESON & CO., Defendant and Third Party Plaintiff,**

v.

The **GLOUCESTER CORPORATION,** Bent Mogelberg and Frances P. Bertolino, Individually and as General Partner of Bertolino & Mogelberg, Third Party Defendants.

Civ. A. No. 92–11812–K.

United States District Court,
D. Massachusetts.

July 21, 1993.

---

### *MEMORANDUM AND ORDER*

KAROL, United States Magistrate Judge.

## I. *INTRODUCTION*

This is a suit for accounting malpractice and misrepresentation brought by Fleet National Bank ("Fleet") and Cooperatieve Centrale Raiffeisen–Boerenleenbank B.A. ("Rabobank") against Tonneson & Company ("Tonneson"), an accounting firm that, prior to the commencement of this lawsuit, had audited the financial statements of a now-defunct company named "The Gloucester Corporation" ("TGC"). Plaintiffs allege that they loaned several million dollars to TGC in reliance upon faulty audits that Tonneson performed and misstatements that Tonneson made about the quality and thoroughness of those audits. Plaintiffs seek to recover from Tonneson the loan balances outstanding, on the theory that, but for Tonneson's misdeeds, the loans, which are now in default and uncollectible, would never have been made.

Presently before the court is a motion (Docket # 7) by Tonneson to compel plaintiffs to produce all three volumes of a report identified as the "Kroll Report." For reasons which follow, the motion is denied.[1]

## II. *BACKGROUND*

Based upon the filings of the parties and representations of counsel made at oral argument, it appears that several lawsuits and federal investigations, civil as well as criminal, are underway concerning the affairs of TGC. It is undisputed that, for reasons that are not entirely clear from the record, plaintiffs' counsel has been serving as custodian for all documents gathered by all counsel and federal authorities related to all these lawsuits and investigations. Plaintiffs' counsel

thus accumulated more than 50,000 documents in its Boston offices, in addition to a trailer full of uncounted documents stored at a site in Providence, Rhode Island. Persons working under the supervision of plaintiffs' counsel were in the process of stamping and indexing all these documents at the time Tonneson's counsel conducted the document inspection that gives rise to the present dispute.

At some point that is not clear from the record, plaintiffs' lead trial counsel retained an organization named Kroll Associates ("Kroll"), an accounting firm, to assist him in analyzing and evaluating the Tonneson audits that are the subject of the complaint. Kroll poured over TGC's financial records and the Tonneson audits and prepared its three volume report for use by plaintiffs' counsel in this case. There is no dispute that, but for Tonneson's various arguments considered below, the Kroll Report would be protected work product.

In anticipation of a Rule 34 inspection by Tonneson's counsel of all the approximately 50,000 documents located in Boston, plaintiffs' counsel attempted to screen and remove from the Boston documents any materials that were protected by the attorney-client or work product privilege. Among the documents removed prior to production were Volumes I and II of the Kroll Report. Solely through inadvertence, counsel failed, however, to remove Volume III before tendering all the remaining documents to Tonneson's counsel for inspection.

Tonneson's counsel found Volume III among the documents produced and, while he was still in the offices of plaintiffs' counsel, spent some time reviewing its contents. A junior associate employed by plaintiffs' counsel's firm was in attendance during the inspection. Tonneson's counsel asked her if she could locate Volumes I and II for his review. There is some dispute as to whether or not she said she would attempt to do so, but it is clear that she did not immediately

---

1. Tonneson's motion to compel, as filed, was not limited to the present dispute regarding the discoverability of the Kroll Report, but the parties were able to resolve all other disputes raised by that motion.

demand the return of Volume III.[2] Nor did she ever produce Volumes I and II for inspection.

Upon his completion of this initial inspection, Tonneson's counsel, pursuant to procedures previously agreed upon, designated Volume III of the Kroll Report as one of many documents to be copied and furnished to him. He also requested copies of Volumes I and II. Several days later, Tonneson's counsel received from plaintiffs' counsel copies of many of the documents he had designated for copying, but plaintiffs refused to produce any volumes of the Kroll Report on the grounds of work product privilege. This motion followed.

## III. *ANALYSIS AND DISCUSSION*

Tonneson presents three arguments in support of its motion to compel production of the Kroll Report: 1) plaintiffs, says Tonneson, will surely designate as an expert witness in this case either a Kroll accountant or another accountant who will certainly rely upon the Kroll Report; 2) plaintiffs' original responses to Tonneson's document requests expressed an unqualified willingness to produce certain categories of documents which, as those categories were described in Tonneson's requests, would have included the Kroll Report; and 3) production of Volume III of the Kroll Report constituted a waiver of the work product privilege as to all three volumes, but, even if not as to all three, certainly as to Volume III. The first two arguments are easily disposed of; the third is more troubling.

### A. *Relationship Between Kroll Report and Expert Testimony*

It is premature to say that Kroll Associates will be designated by plaintiffs as an expert witness in this case[3] or that any other accounting expert designated by plaintiffs

will rely upon the Kroll Report. If and when either of these events occurs, there will be time enough to consider the question whether the Kroll Report must be turned over to Tonneson.

### B. *Agreement to Produce*

Tonneson contends that plaintiffs, in their responses to Request Nos. 13, 18, 19 and 20 of Tonneson's document request, agreed without qualification to produce all documents in certain categories that were described broadly enough to encompass the Kroll Report. For reasons discussed below, these requests cannot fairly be read to reach the Kroll Report. The court need not address, therefore, the question whether plaintiffs waived their right to assert the privilege by failing to qualify their affirmative responses to these requests.

Request No. 13 asked for "audited and unaudited financial statements prepared, reviewed or read by Coopers & Lybrand concerning [TGC]." The Kroll Report does not constitute "financial statements," as that term is commonly understood, and there is no indication that it was prepared, reviewed or read by the unaffiliated accounting firm of Coopers & Lybrand.

Request No. 18 sought "internal audit reports generated by Fleet or Rabobank concerning [TGC]." The Kroll Report was not an internal audit report, and neither Fleet nor Rabobank generated it.

Request No. 19 called for "work papers and correspondence of Coopers & Lybrand concerning [TGC and others]." Again, the Kroll Report was prepared by Kroll Associates, not by Coopers & Lybrand. Also, it is doubtful that it could be characterized as "work papers" or "correspondence."

Request No. 20 asked for "documents concerning any consultant contacted by or hired

---

**2.** There is no indication in the record whether Volume III was marked in any manner to show that it was confidential or subject to a privilege. Nor is there any evidence to suggest that the junior associate should otherwise have appreciated its privileged status, for example by observing that its contents were obviously work product or as the result of her having had some previous involvement with its preparation. Therefore, even if, as alleged by Tonneson, this newly-ad-

mitted attorney did agree to locate Volumes I and II, the court would not, on the basis of such assent alone, find that there had been an actual intent to waive the privilege.

**3.** In fact, plaintiffs assert that they will not be calling Kroll Associates as an expert witness. Plaintiffs' Opposition to Defendant's Motion to Compel and Motion for Protective Order, at 6.

by Fleet or Rabobank concerning [TGC]." There is no dispute that plaintiffs' counsel, not Fleet or Rabobank, contacted and hired Kroll.

Since none of these requests can fairly be read to call for the production of the Kroll Report, plaintiffs' failure to make an objection when they responded to those requests does not even arguably constitute a waiver of their right to assert the privilege now.

## C. *Waiver by Inadvertent Production*

A more substantial waiver issue is raised by the fact that plaintiffs' counsel inadvertently permitted Tonneson's counsel to inspect Volume III of the Kroll Report. This waiver issue itself breaks down into two discrete subissues: 1) whether inadvertent production of Volume III constitutes a waiver of the work product privilege as to that volume, and 2) whether inadvertent production of Volume III constitutes a waiver with respect to Volumes I and II.

Many courts have considered the circumstances under which the *attorney-client* privilege is waived by an inadvertent disclosure to an adversary of a document that would otherwise have been protected by that privilege. *E.g., In re Sealed Case*, 877 F.2d 976 (D.C.Cir.1989); *International Digital Systems Corp. v. Digital Equipment Corp.*, 120 F.R.D. 445 (D.Mass.1988) (Collings, M.J.).[4] Relatively few courts, however, and apparently none at the appellate level,[5] have squarely analyzed the question presented here—whether, and the circumstances under which, inadvertent disclosure of work product to an adversary gives rise to a waiver. In the absence of controlling precedent, the court will discuss the general principles upon which it bases its conclusion that no such waiver occurred here.

It is helpful to begin the analysis with a comparison of certain aspects of the attorney-client and work product privileges.

In any particular case, the attorney-client privilege can stand as a major obstacle to the factfinding process. A party may invoke it to conceal information of utmost relevance to even the most important factual issues in a case. Nevertheless, the privilege remains inviolate, as long as the conditions for its invocation are met. The justification for this seemingly anomalous result is that the privilege serves a vital collateral interest; it assures attorneys and clients that whatever they discuss about their case in confidence will remain confidential. Without this assurance, attorneys and clients might be inhibited from engaging in the free, complete and candid exchange of information that is the cornerstone of an effective attorney-client relationship. This free flow of information is considered so important in a society of laws, such as ours, that, in order not to impair it, courts are willing to restrict in material ways a party's access to highly relevant information.

Because the attorney-client privilege can and often does seriously impede the search for truth in a particular case, courts are naturally reluctant to extend it beyond the narrowest limits required to achieve its purpose of fostering effective attorney-client communication. *See, e.g., In re Grand Jury Proceedings*, 727 F.2d 1352, 1355 (4th Cir. 1984), and cases cited. It is not surprising, therefore, that, in certain recurring types of borderline cases, courts have often questioned the existence of a need to recognize the privilege. For example, as noted, courts have frequently addressed the question whether the attorney-client privilege should continue to protect communications after they have inadvertently been disclosed.

---

**4.** Courts have also frequently addressed the question of whether a waiver of the *work product* privilege occurs when an attorney *intentionally* discloses work product to an ally or to a party who, at the time of disclosure, was an adversary or potential adversary in prior litigation. *E.g., Republic of the Philippines v. Westinghouse Electric Corp.*, 132 F.R.D. 384 (D.N.J.1990); *In re Atlantic Financial Management Securities Litigation*, 121 F.R.D. 141 (D.Mass.1988). Although these cases are not directly on point, they do support the general proposition that work product, at least in some circumstances, may be disclosed without losing its protected status.

**5.** *But cf. Transamerica Computer Company, Inc. v. International Business Machines Corp.*, 573 F.2d 646, 647 n. 1 (9th Cir.1978) (court states, in dictum, that where inadvertent disclosure would constitute a waiver of attorney-client privilege, it will also constitute a waiver of work product privilege).

How any particular court answers this question likely will depend, ultimately, upon how it answers another question: how much protection is *minimally* required to provide adequate assurances to attorneys and clients in future cases that their confidential communications will remain protected notwithstanding that those communications may be inadvertently disclosed.

Obviously, there is no objectively correct answer to this question. Thus, courts have not been uniform in their responses or in their decisions. Some courts, for example, have held that any disclosure, however slight, automatically constitutes a waiver of the privilege. Their rationale is that information ceases to be confidential the moment it is disclosed. *E.g., Federal Deposit Insurance Corp. v. Singh,* 140 F.R.D. 252 (D.Me.1992); *International Digital Systems Corp. v. Digital Equipment Corp.,* 120 F.R.D. 445 (D.Mass.1988) (Collings, M.J.). Therefore, once it is disclosed, parties can no longer have a reasonable expectation of privacy with respect to that communication, and they cannot reasonably be disappointed if the court ceases to consider it privileged. In essence, courts that subscribe to this view are saying that future communication will not be unduly inhibited as long as attorneys and clients are assured that their discussions will remain private until they themselves disclose them.

Other courts are willing to recognize the privilege despite inadvertent disclosure, provided the attorney and client took reasonable, albeit imperfect, precautions to guard against it. *E.g., Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 104 F.R.D. 103 (S.D.N.Y.1985) (applying same standard to attorney-client and work product documents). This rule reflects the view that attorneys and clients will be unduly inhibited in their communications if they know that waiver will invariably result if, despite their reasonable efforts to prevent them, leaks occur.

Finally, some courts go even further and find no waiver unless the disclosing party in fact intended to waive the privilege. *E.g., The Connecticut Mutual Life Insurance Co. v. Shields,* 18 F.R.D. 448, 451 (S.D.N.Y.1955). This position reflects the view that future attorneys and clients will be unduly inhibited in their communications unless they know that their confidential communications will be kept secret until they consciously decide to disclose them.

The essential point, as all courts that have addressed this question have recognized, is that the attorney-client privilege can be a major impediment to the search for truth. A proper balance between the competing objectives of securing a just determination of the matter in dispute and fostering open communication between attorney and client can therefore be achieved only by extending the privilege no more than is absolutely necessary to achieve the latter objective.

The work product privilege, like the attorney-client privilege, serves a vital purpose in our adversary system. Attorneys need to be able to prepare their cases in an environment which they know will be off limits to the prying eyes and ears of opponents. To the extent there is any risk that they will have to deliver to those opponents their ideas, theories and analyses and those of their consultants, they will be far more circumspect in what they put down or permit their consultants to put down on paper, assuming they remain willing to retain consultants at all. Without the privilege, efficiency and effectiveness will, thus, inevitably decline. Also, to the extent such disclosure is actually mandated, less conscientious opponents, who are unable or unwilling to invest the time or money to prepare as thoroughly, will gain a windfall. Concerns such as these prompted the Supreme Court to recognize the work product privilege in the landmark case of *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). The privilege was subsequently codified in Fed.R.Civ.P. 26(b)(3), (4).

Although the attorney-client privilege and the work product privilege have certain similarities, there is also one overriding difference between them. The attorney-client privilege often conceals information that has a direct bearing on the proper resolution of matters in dispute; the work-product privilege rarely, if ever, does. The substantive content of work product, particularly so-called opinion work product, *see In re San Juan Dupont Plaza Hotel Fire Litigation,*

859 F.2d 1007, 1014–15 (1st Cir.1988), is almost certainly of no legitimate use to an opponent.[6] While it would no doubt provide a tremendous tactical advantage to an adversary to be able to pry into the "mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation," Fed.R.Civ.P. 26(b)(3), a competent adversary will never need access to such information in order to prepare and present his or her case effectively.[7]

Even as to non-opinion work product, because of exceptions built directly into the privilege, there will rarely if ever be a case where the privilege will operate to deprive a party of access to truly needed information. Thus, Fed.R.Civ.P. 26(b)(3) provides that a party may obtain discovery of the non-opinion portion of work product "upon a showing that [it] has substantial need of the materials in the preparation of [its] case and that [it] is unable without undue hardship to obtain the substantial equivalent of the materials by other means." [8]

Thus, the work product privilege, unlike the attorney-client privilege, does not impede the search for truth in a particular case. Its invocation need never force a court to make a difficult tradeoff between the broad institutional goal of preserving the vitality of the adversary system and the sometimes incompatible goal of achieving justice in the matter before it. It is not a privilege which, to avoid injustice, must be recognized only to the barest extent necessary to achieve its purpose. Indeed, it may fairly be said that work product is protected *because* of its content, while attorney-client communication is protected *despite* its content. For all these reasons, the appropriate question to ask when inadvertent disclosure of work product is involved is not whether it remains essential to continue to recognize the privilege; the question, rather, is whether there is cause not to do so, such as that recognition might work an injustice or impose an undue burden on the judicial system.[9]

For example, if a party to whom work product is inadvertently disclosed can demonstrate that it was misled by, or that it relied to its detriment on, such inadvertent disclosure, it would surely be appropriate for a court to bar the assertion of the privilege. Or if the inadvertent disclosure occurred so far in the past or otherwise under circumstances where it was clear that recognition of the privilege would be an exercise in futility, the privilege could properly be deemed waived. Along the same lines, if the party invoking the privilege failed to take even minimally adequate precautions to guard against inadvertent disclosure, the court could properly withhold protection as a de-

---

**6.** It is well established, of course, that facts do not become non-discoverable merely because they happen to be set forth in a document that qualifies as work product. Wright & Miller, *Federal Practice and Procedure:* Civil § 2023, n. 16. Parties remain free to use conventional discovery devices such as interrogatories and depositions to discover the existence of such facts. *Id.* Therefore, litigants cannot use the work product privilege to shield facts which their adversaries are entitled to know.

**7.** As Justice Jackson stated in his concurring opinion in *Hickman v. Taylor,* 329 U.S. 495, 516, 67 S.Ct. 385, 396, 91 L.Ed. 451 (1947): "[A] common law trial is and always should be an adversary proceeding. Discovery was hardly intended to enable a learned profession to perform its functions … on wits borrowed from the adversary."

**8.** This portion of the Federal Rules appears to be a codification of *Hickman v. Taylor. See* 329 U.S. at 511–13, 67 S.Ct. at 394–95. *See also* Fed.R.Civ.P. 26(b)(4)(B) (party may obtain discovery of facts known and opinions held by non-testifying experts upon a showing that "it is impracticable … to obtain facts or opinions on the same subject by other means").

**9.** This opinion does not address the consequences of intentional disclosure of work product, such as to an ally in the case then under consideration or to someone in a prior case who, at the time of disclosure, was an adversary. *See* note 5, *supra.* Nor does it address the consequences of a party's intentional disclosure to an adversary of selected work product for the purpose of gaining some tactical advantage. The privilege may be lost in such instances for reasons that are not applicable to this case. For example, it may be unfair for a party to make such selective disclosure, or a party's willingness to disclose the information to an adversary in prior litigation may, simply as a matter of credibility, belie the legitimacy of its claim of work product in the first place.

terrent to such laxness in the future.[10] Indeed, in an extreme case, a court could even infer from a party's gross negligence or complete indifference that, at the time the disclosure was made, the party actually did intend to waive the privilege.

Applying this standard, there is no reason to find waiver here. Plaintiffs' counsel surely took at least minimally adequate precautions to avoid inadvertent disclosure. It screened the documents before it produced them, and this screening was successful in catching Volumes I and II of the Kroll Report; it allowed only one privileged document out of some 50,000 documents in all to slip undetected through the initial screening; and it actually caught even the single document that avoided initial detection, before a copy was sent to Tonneson's counsel. With respect to the equities, there is no claim here by Tonneson that it was misled, that it relied to its detriment on the limited disclosure of Volume III or that it would otherwise be unjust, at this point, not to compel production. Finally, given the brief and limited disclosure that occurred here, it cannot be said that it would be futile to permit the document to be withheld at this stage.[11] In the absence of any other compelling reason to order production of Volume III of the Kroll Report, Tonneson's motion to compel must be denied.

Since no waiver occurred with respect to Volume III of the Kroll Report, it should be clear that Tonneson's motion must also be denied with respect to Volumes I and II. Moreover, even if inadvertent disclosure of Volume III, without more, were grounds to compel the production of Volume III, there would be no basis for a finding that a so-called "subject matter waiver" had occurred. *See Duplan Corp. v. Deering Milliken, Inc.,* 540 F.2d 1215, 1222–23 (4th Cir.1976); *The Prudential Insurance Co. v. Turner & Newall, PLC,* 137 F.R.D. 178, 182–83 (D.Mass.1991) (Collings, M.J.). Thus, Tonneson's motion to compel the production of Volumes I and II must be and is denied for this reason as well.

### ORDER

For the foregoing reasons, Tonneson's motion to compel the production of Volumes I, II and III of the Kroll Report is hereby DENIED.

---

**10.** Whenever a party seeks a court's assistance in avoiding the consequences of its own inadvertent disclosure, it is asking that limited public resources be used to solve a problem that might not have arisen if the party had initially made a greater effort to preserve the privilege. Courts are and should be available in a variety of contexts to provide relief to parties from the consequences of their own mistakes, *e.g.,* Fed.R.Civ.P. 60(b), but, for deterrent purposes, courts may and should hold parties accountable for failing to make a reasonable effort to protect privileges that were created for their own benefit.

**11.** It should again be emphasized that plaintiffs' counsel realized its mistake within a few days of its occurrence and before a copy of Volume III was actually delivered to Tonneson's counsel. *See Martin v. Valley National Bank of Arizona,* 1992 WL 196798, 1992 U.S.Dist. LEXIS 11571 (S.D.N.Y. Aug. 6, 1992) (court characterizes sixteen-day period between the time a privileged document was produced and the time its return was demanded as a "negligible span of time [that] supports the conclusion that ... production of the memorandum was a mistake rather than a knowing waiver of Rule 26(b)(4)(B)'s protection.").