Klonoski v. Mahlab                          CV-95-153-M    12/12/96 P
                  UNITED STATES DISTRICT COURT FOR THE
                         DISTRICT OF NEW HAMPSHIRE


Richard F. Klonoski, et al.
      Plaintiff

      v.                                          Civil No. 95-153-M

Benjamin Mahlab, et al.,
      Defendants.


                              O R D E R


      This is a medical malpractice action in which Dr. Richard F.

Klonoski, both individually and as the administrator of the

Estate of Jolanta Klonoski, seeks damages for the wrongful death

of his wife, Jolanta.  Mrs. Klonoski died shortly after giving

birth to a healthy baby girl at Dartmouth Hitchcock Medical

Center ("DHMC").  At issue is the discoverability of certain

notes prepared by Richard Burke, manager of DHMC's liability

claims program, as (and after) he interviewed a number of DHMC

staff members who witnessed or participated in Mrs. Klonoski's

medical treatment.  Defendants claim that Burke's notes are

shielded from discovery by the attorney-client privilege and/or

the work-product doctrine.


      By order dated July 16, 1996, the court granted in part

plaintiff's motion to compel the production of Burke's notes.

Defendants now move the court to reconsider that order.  They argue that the court erred in ruling that Burke's notes: (i) are not shielded from discovery by the attorney-client privilege; and (ii) at best constitute "ordinary" (and not "opinion") work product subject to disclosure, given plaintiff's showing of substantial need.

For the reasons set forth below, the court reaffirms its order of July 16, 1996, granting in part plaintiff's motion to compel defendants to produce designated interview notes prepared by Burke.

I.   Defendants' Claims Regarding Opinion Work Product.

This issue does not require extensive discussion. Defendants merely reiterate that Burke's notes are entitled to the heightened protections afforded "opinion" work product.  They claim that "a complete review of the Documents establishes that the Documents contain mostly opinion work product, which Plaintiffs are not entitled to discover regardless of any substantial need and undue hardship."  Defendants' Memorandum of Law in Support of Motion for Reconsideration at 10-11.

2

Having again carefully reviewed each of Burke's notes _in camera_, the court finds that defendants' contention lacks both a legal and factual basis. To the extent Burke's notes contain some "opinions," they are those of the _witnesses_, not Burke. Mr. Burke simply recorded what the witnesses told him about the circumstances surrounding Mrs. Klonoski's care. On occasion, the witnesses expressed _their_ opinions regarding the care provided to Mrs. Klonoski and what aspects of that care may have, in their view, met or fallen below acceptable standards. Materials of that sort do not constitute _attorney_ _opinion_ work product and they are not entitled to heightened protection from discovery. See _In re San Juan DuPont Plaza Hotel Fire Litigation_, 859 F.2d 1007, 1015 (1st Cir. 1988) ("Whatever heightened protection may be conferred upon opinion work product, that level of protection is not triggered unless the disclosure creates a real, _nonspeculative danger of revealing the lawyer's thoughts_.") (emphasis added).

Because it is reasonable to conclude that Burke's notes of the witnesses' statements could lead to discoverable evidence, and because plaintiff has demonstrated both a substantial need for those notes and an inability to obtain substantially the same information through other means (due to the witnesses' now faded

memories), Burke's notes are not shielded from discovery by the work-product doctrine.  <u>See</u> Fed. R. Civ. P. 26(b)(3).


II.  <u>The Attorney-Client Privilege - Communications between a</u>
     <u>Client and a Representative of the Client's Attorney</u>.

In its earlier order, the court ruled that defendants failed to establish that the staff members fell within the so-called corporate "control group" at DHMC and, therefore, that defendants failed to demonstrate that the staff members' statements to Burke qualified under New Hampshire's attorney-client privilege as statements by a "client" (i.e., DHMC) or as statements by "representatives of a client" to the client's attorney.  <u>See</u> N.H. Evid. R. 502(a)(2).  In short, the court concluded that the staff members were not acting as the corporate client nor as "representatives" of the corporate client when they spoke to Burke.[1]

_____

Parenthetically, the court notes that when the <u>defendants</u> initially "invoked" the attorney-client privilege with regard to Burke's notes, the staff members who made statements to Burke (and who are said to hold the privilege as individual clients) were not parties to this litigation and had not invoked the privilege themselves.  Defendants' counsel took the position at the hearing that <u>they</u> invoked the privilege on behalf of the staff members in their capacity as counsel to the individual staff members, and not in their capacity as counsel to defendants.  After some discussion, counsel moved to permit the staff members to intervene for the limited purpose of invoking their claimed privileges.  The court granted that motion.  Therefore, the record is now clear that current defense counsel represent the named defendants and non-

4

In their motion for reconsideration, defendants, and now the intervening staff members whom Burke interviewed, assert that DHMC's legal counsel at the time, Attorneys David Cleary and Anil Madan, represented not only DHMC but also simultaneously represented them, individually. And, based on those alleged discrete attorney-client relationships, each staff member seeks to invoke his or her own attorney-client privilege in this case. In support of their position, intervenors note that DHMC is contractually obligated to provide all its employees with legal representation should they be sued. So, intervenors claim that when Burke interviewed them, he was acting as a representative of not only DHMC's counsel, but of their counsel as well. Accordingly, they conclude that any communications between them as DHMC staff members (i.e., as clients of Attorneys Cleary and Madan) and Burke (as the representative of those attorneys) are protected from disclosure by the attorney-client privilege. See N.H. Evid. R. 502(b)(1).

The question raised here is, then, whether the DHMC staff members were actually "clients" of Attorneys Madan and/or Cleary

_____

party staff members and each affected staff member is personally asserting the attorney-client privilege with regard to his or her statements to Burke.

5

when they were interviewed by Burke.  New Hampshire's attorney-client privilege, applicable here, provides:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client (1) between the client . . . and the client's lawyer or the lawyer's representative . . ..

N.H. Evid. R. 502(b).  In order to invoke the protections afforded by New Hampshire's attorney-client privilege, each staff member must demonstrate that: (1) when speaking to Burke, he or she was (or sought to be) a client of Attorneys Madan and/or Cleary; (2) Burke was acting as the representative of Madan and/or Cleary (in their capacity as counsel to the staff member) when he conducted the interviews and prepared his notes; (3) the notes contain information communicated by the staff member for the purpose of facilitating the rendition of legal services to the staff member; and (4) the privilege has not been waived.

The intervening staff members have submitted affidavits to support their invocation of the privilege.  The affidavits are substantially identical in form and content, and recite that: (1) following Mrs. Klonoski's death, each staff member was concerned that he or she might be named as a defendant in a malpractice

6

suit; (2) each staff member realized that if he or she was named as a defendant in civil litigation, DHMC would pay for an attorney who would represent his or her interests; and (3) each staff member understood that Burke was assisting legal counsel by gathering "confidential" information which counsel would use in providing legal advice to the staff member and DHMC.

Those affidavits, though obviously prepared with skill and care, are particularly notable for what they fail to say rather than for what they do say. Indeed, if one reads the affidavits with the same care and attention to detail with which they were obviously prepared, several omissions are glaring. For example, no staff member plainly states that he or she knew or thought that Burke was working for <u>his</u> or <u>her</u> attorney at the time of the respective interviews. Nor do the staff members say that they believed that their statements were made in the context of an existing attorney-client relationship, to facilitate the rendition of current legal services to <u>them</u>. No staff member states that he or she sought out Burke (or the attorneys) anticipating a need for personal legal services, rather it was Burke that sought them out. Because such basic facts, and the factual context, are relevant in determining the existence of the

7

privilege claimed, such omissions from the affidavits is surprising.

The staff members' honest belief that their statements to Burke were generally "confidential," their general understanding that Burke was working at the direction of an attorney, and their impression that the statements given would be used by DHMC's attorney in providing some type of legal advice to the staff member at some indefinite point in the future, are, on the other hand, insufficient, standing alone, to establish that the staff members actually had an attorney-client relationship with Attorneys Madon and Cleary, or even reasonably believed that when they spoke with Burke they were speaking with <u>their</u> lawyer's agent.[2]  In a very general sense, perhaps, the touchstones of a

---

The staff members no doubt had the "understandings" they claim.  But it is not at all clear just what those understandings were.  Although couched in the language of attorney-client privilege, the cryptic affidavits filed by the staff members fail to reveal the nature and the basis for those understandings.  It is entirely plausible that the staff members truly believed their statements would be "confidential," but only in the general sense that information regarding patients, the rendition of medical care, and medical facility operations is usually "confidential" and not generally subject to public disclosure.  The staff affidavits do not establish that they expected confidentiality because they were talking to their attorney about privileged matters.  The staff members also might be saying that their statements to Burke (who disclosed that he was working, at least in part, for DHMC's risk management division) were "confidential" to the extent that they believed Burke was investigating Mrs. Klonoski's death on behalf of DHMC's "quality assurance committee."  <u>See</u> N.H. Rev. Stat. Ann. 151:13-a (records of interviews and all other reports and

8

valid privilege are alluded to in the affidavits, but more is
required to establish the privilege, especially in light of the
otherwise unsupportive record.

The record presented by defendants and intervenors shows,
for example, that Burke himself never claimed to be the agent of
any staff member's attorney.  He said nothing to the staff
members that could have reasonably led any of them to believe
that any attorney was representing them, or that Burke was
working for an attorney representing them.  Mr. Burke's affidavit
provides, in pertinent part:

> Beginning on or about 5/17/93, I began my on-site
> investigation and interviewed a number of nurses and
> physicians.  I would have told each of my role as
> Service Center Manager, including the fact that <u>I had
> been retained by D-HMC to manage their professional
> liability claims program</u>, and <u>had been directed by the
> D-HMC Risk Management Department and their counsel</u>
> [presumably, risk management's counsel] to undertake a

statements generated during the activities of a hospital's quality
assurance committee are confidential and protected from discovery);
<u>see generally</u>, <u>In re K</u>, 132 N.H. 4 (1989) (discussing the nature
and scope of the statutory privilege).  And, they no doubt
understood that DHMC's attorneys would use their statements to
defend DHMC and, if necessary or appropriate, to provide some kind
of pertinent legal advice to them in the future (perhaps merely
advising them to get legal counsel). Nevertheless, critical issues
remain unaddressed: did the staff members understand that DHMC's
attorneys were also <u>their</u> attorneys, and did they understand that
their statements were made to a representative acting for <u>their</u>
attorneys in that personal capacity?

9

>thorough investigation of the Klonoski matter. I would have told them of the virtual certainty that litigation would ensue, that allegations of nursing negligence would probably be made, that they were insureds under the D-HMC self-insurance program, and that they <u>would</u> be defended by counsel <u>approved by D-HMC</u>, <u>as necessary</u>, and that they would be asked to meet with defense counsel as the investigation developed.

Burke Supplemental Affidavit at para. 10 (emphasis added). Accepting that Burke actually told the staff members what he believes he "would have" told them (there is nothing to the contrary in the record and defendants and intervenors are the ones offering his affidavit), no staff member could have reasonably believed that, when speaking to Burke, he or she was speaking to a representative of his or her own lawyer. In fact, based upon Burke's representations, a reasonable person in the position of a staff member could only reasonably conclude that Burke was working for legal counsel retained by and representing DHMC (or its Risk Management Department); that only if it became "necessary" "would [each staff member] be defended by counsel"; and, then, legal representation would be provided each staff member only after designated counsel had been "approved by D-HMC." That is, staff members could have reasonably concluded only that at some time in the future, if it became necessary, an attorney would be provided for them as individuals, after DHMC approved such counsel.

10

Significantly, Burke scheduled the interviews for his own purposes and he did not tell any staff member he interviewed that legal counsel had already been "approved" by DHMC and retained to represent that staff member's interests.  Nor did he tell any staff member that he was acting as the agent of an attorney who had been appointed to act as that staff member's counsel.  Nor did he tell any staff member that DHMC's attorneys were simultaneously acting as counsel to all employees, whatever their respective and potentially conflicting interests might be.  It is, therefore, difficult to understand how staff members can claim that they each knew or even reasonably understood that Burke was working for <u>his</u> or <u>her</u> attorney when interviewed.  At best, the affidavits submitted, taken together, demonstrate that each staff member understood that Burke was working for DHMC's (Risk Management's) legal counsel (<u>not</u> their own counsel), and he was gathering information for use by both the Risk Management Department, and DHMC's legal counsel in defending DHMC in any lawsuits that might arise from Mrs. Klonoski's death.[3]

---

Ordinarily, communications between an individual and a third party's counsel are not protected by the attorney-client privilege. <u>But see</u> N.H. Evid. R. 502(b)(3) (providing that the attorney-client privilege attaches to communications between an individual and a lawyer representing <u>another</u> <u>party</u> in a <u>pending</u> <u>action</u> and concerning a matter of common interest therein).  Importantly, defendants do not claim (nor could they) that Burke's notes are protected by Rule 502(b)(3).  Instead, their argument

Finally, neither Attorney Madan nor Attorney Cleary (the outside counsel at whose direction Burke was ostensibly acting, at least in part) claims to have represented any of the staff members when they spoke to Burke about his investigative plans. For example, Attorney Madan's affidavit provides, in pertinent part, only that:

> During the course of my law practice, I am regularly retained by Mary Hitchcock Memorial Hospital ("Hospital") and the Hitchcock Clinic ("Clinic") and asked to provide legal advice concerning claims or potential claims for deaths or injuries that occur to DHMC patients. I am also retained to serve as defense counsel for DHMC in matters that are litigated.

Affidavit of Anil Madan, at ¶ 2. Based upon the representations made in Attorney Madan's affidavit, it is clear that he viewed himself as counsel to the corporate entities DHMC and the Hitchcock Clinic and not as simultaneously representing every individual employee of those entities. (Attorney Cleary's affidavit is substantially similar.)

Absent some indication by Burke's alleged principals (i.e., Cleary and Madan) that they were representing the individual

rests solely on the assertion that Burke was acting as the representative of the staff members' own attorney and his notes are privileged under N.H. Evid. R. 502(b)(1).

12

staff members as well as DHMC, and given the decidedly ambiguous record developed by those asserting the privilege, the court cannot conclude that the intervening staff members have carried their burden of demonstrating that the attorney-client privilege attaches to their statements as contained in Burke's notes.

In sum, Burke's representations to the staff members establish that: (1) DHMC had not yet deemed it "necessary" to provide counsel to represent each staff member; (2) DHMC had not yet "approved" counsel to represent each staff member; and, therefore, (3) the staff members were not being represented by Cleary or Madan when they spoke to Burke. The staff members' affidavits are insufficient to establish that they actually thought, or could have reasonably thought, that Burke was acting as the agent for their lawyer(s) or that their statements to Burke were made in the context of an attorney-client relationship or even in the context of each staff member seeking such a relationship. And, finally, the affidavits of Attorneys Cleary and Madan provide no support for the claim that they represented or even remotely thought they represented the individual staff members when they spoke to Burke (seemingly in passing) about Burke's investigative plans. The staff members' statements to

13

Burke, as agent for the corporation's counsel, are not protected by the attorney-client privilege.

If the DHMC staff members, Burke, and Attorneys Madan and Cleary had testified at the hearing on defendants' motion to reconsider perhaps many of the ambiguities in this record could have been clarified; perhaps not. In any event, the court obviously cannot speculate as to what they might have said. Defense counsel (in their capacity as counsel to the staff members) chose to rely exclusively on the submitted affidavits and oral argument,[4] and that record is insufficient to support the conclusion that the staff members consulted with Burke with the understanding that he was a representative of their lawyer(s), and "for the purpose of facilitating the rendition of professional legal services" to them. N.H. Evid. R. 502(a)(1). Accordingly, the court finds that the staff members were not "clients" and were not seeking to become clients of DHMC's legal counsel when they gave their statements to Burke. Therefore, the

Defendants and the intervening staff members were well aware of the dispositive issues when they submitted their motion for reconsideration. Nevertheless, rather than prepare supplemental affidavits which might have clarified the factual bases for the asserted privileges, they chose simply to rely on the affidavits previously submitted.

14

staff members' statements to Burke as contained in his notes are not shielded from discovery by the attorney-client privilege.

III. <u>Communications Between an Insured and the Insurer's Agent</u>.

Defendants and the intervening staff members offer an alternate theory under which they claim that Burke's notes are shielded from discovery. They argue that those documents should be protected by an extension of the attorney-client privilege which, in some jurisdictions, applies to communications between an insured and an insurance claims investigator. To be sure, some courts have recognized that when an insurance policy requires an insurer to provide an insured with a defense, the insured's statements to the insurer (through its claims investigator) are privileged. So, for example, the Illinois Court of Appeals has held:

> In Illinois, the attorney-client privilege extends to communications between an insured and insurer, where the insurer is under an obligation to defend. This rule underscores the fact that the insurance carrier usually selects the attorney under a common liability contract. Therefore, "the insured may properly assume that the communication is made to the insurer as an agent for the dominant purpose of transmitting it to an attorney for the protection of the interests of the insured."

15

Hyams v. Evanston Hospital, 225 Ill.App.3d 253, 257, 587 N.E.2d 1127, 1129 (Ill. App., 1992) (citations omitted).

Courts that have expanded the attorney-client privilege in the same manner as Illinois appear to have done so based upon a willingness to recognize that an insurer will likely hire an attorney to represent the insured and, presumably, if the attorney had been retained immediately, he or she would have instructed the investigator to gather information and take statements from the insured prospective client. Thus, some courts have held that a claims investigator acts as the agent of an attorney (to be retained in the future) when he or she speaks to an insured about a matter which implicates the obligation to provide a defense, thereby recognizing a sort of "anticipatory" attorney-client privilege.

In this case, DHMC is self-insured for the first $2,000,000 of each medical malpractice claim made against it or any of its employees. Additionally, it is apparently obligated to defend and indemnify all DHMC employees named as defendants in medical malpractice actions, provided the employees were acting within the scope of their employment when the alleged act(s) of negligence occurred. Accordingly, intervenors' counsel argues

16

that the court should view DHMC as an "insurer" for the purpose of determining whether statements made by its "insureds" (its staff members) to its claims investigator (Burke) are privileged under the described anticipatory attorney-client privilege. Stated somewhat differently, defendants suggest that the court should: (1) find that DHMC was acting in its capacity as "insurer" when it hired Burke and instructed him to conduct an investigation; and (2) hold, as a matter of New Hampshire law, that each staff member's statements to Burke, as agent for DHMC (in its role as insurer), fall within the scope of New Hampshire's attorney-client privilege.[5]

The court is not inclined to accept that invitation. Whether the Illinois rule and similar rules in other states represent a wise development in the law of privileges is somewhat beside the point, since the New Hampshire Supreme Court has not recognized an anticipatory attorney-client privilege that protects communications between an insured and an insurance investigator. Given that evidentiary privileges have

---

This argument is, of course, in direct conflict with defendants' claim that Burke was acting as the agent of DHMC's legal counsel (to be distinguished from DHMC as insurer) when he interviewed the staff members. Nevertheless, defendants' argument does merit discussion.

17

traditionally been construed narrowly by the courts of this state, it is also unlikely that the New Hampshire Supreme Court would, if presented with the opportunity to do so, expand the attorney-client privilege in the manner urged by defendants. See, e.g., State of New Hampshire v. Melvin, 132 N.H. 308, 310 (1989) (noting that "[i]t is well settled that statutory privileges should be strictly construed."); N.H. Evid. R. Evid. 501, Reporter's Notes (noting that "Rule 501 limits the sources of present rules of privilege to the federal and state constitutions, federal and state statutes and to these Rules of Evidence and other rules of court. The existing common law is thus no longer a source of evidentiary privilege doctrine."); see also Fleet Nat. Bank v. Tonneson & Co., 150 F.R.D. 10, 13 (D. Mass. 1993) ("Because the attorney-client privilege can and often does seriously impede the search for truth in a particular case, courts are naturally reluctant to extend it beyond the narrowest limits required to achieve its purpose of fostering effective attorney-client communication."). And, as this court previously held:

> The court is not inclined to stretch the precise
> language employed in New Hampshire's rules of evidence
> to cover the facts presented in this case . . . A
> federal court called upon to apply state law must "take
> state law as it finds it: `not as it might conceivably
> be, some day; nor even as it should be.'" Kassel v.

18

> Gannett Co., 875 F.2d 935, 950 (1st Cir. 1989) (quoting
> Plummer v. Abbott Laboratories, 568 F. Supp. 920, 927
> (D.R.I. 1983)). When state law has been
> authoritatively interpreted by the state's highest
> court, this court should apply that law according to
> its tenor. Kassel, 875 F.2d at 950. Where the
> signposts are blurred, the federal court may assume
> that the state court would adopt an interpretation of
> state law that is consistent with logic and supported
> by reasoned authority. Moores v. Greenberg, 834 F.2d
> 1105, 1107 n.3 (1st Cir. 1987). However, this court is
> and should remain hesitant to blaze new, previously
> uncharted state-law trails. Expansive reading of New
> Hampshire statutes and rules of evidence and the
> broadening of evidentiary privileges available under
> them is a function best left to the New Hampshire
> Legislature and Supreme Court.

Klonoski v. Mahlab, No. 95-C-153-M, slip op. at 8-9 (D.N.H. July 16, 1996).

In summary then, the court is constrained to hold that the staff members have failed to carry their burden of demonstrating that Burke's notes on their statements are shielded from discovery under New Hampshire's attorney-client privilege. They have not sufficiently developed the record to persuade the court, even by a preponderance of the evidence, that Burke's notes fall within the scope of that privilege.

while the affidavits submitted by the intervening staff members allege or allude to facts and conclusions which, if

19

considered in isolation, might suggest that their statements to Burke could be privileged, the seemingly incomplete, definitely ambiguous, and predominantly conclusory statements contained in those affidavits are insufficient to support the claimed privilege, given the record in this case. It is of course the intervening staff members who bear the burden of demonstrating that their communications with Burke are shielded by the attorney-client privilege. As noted in Moore's Federal Practice, the general rule that evidentiary privileges are to be strictly construed requires that "the burden for establishing [the] existence [of a given privilege be] placed upon the party asserting it. Thus, a bald assertion of privilege is insufficient, . . . since a trial court must be provided with sufficient information so as to rule on the privilege claim." 4 J.M. Moore & J.D. Lucas, Moore's Federal Practice ¶ 26.11[1] (1994) (footnotes omitted).

In the end, it is likely, and the court concludes, that the circumstances presented are just what they appear to be: a corporate defendant seeks to shield potentially damaging statements made by some of its employees to its investigator from discovery by asserting a blanket attorney-client privilege extending to all statements made by any employee to its corporate

20

investigator. The record fails to support defendants' (or, more precisely, the staff members') invocation of that special privilege, and certainly no policy reasons militate in favor of recognizing such a privilege under the circumstances presented here.

Conclusion

Defendants' motion for reconsideration (document no. 40) is granted. Having heard counsels' oral presentations, reviewed the pleadings and exhibits submitted (including Burke's notes), and having considered the parties' respective arguments, the court affirms its order dated July 16, 1996. Defendants' motion to stay the court's order dated July 16th (document no. 42) is denied as moot.

SO ORDERED.

_____
Steven J. McAuliffe
United States District Judge

December 12, 1996

cc:   Donald J. Williamson, Esq.
      Joan A. Lukey, Esq.
      James P. Bassett, Esq.