UNITED STATES of America, Plaintiff,

v.

**Ronald W. SKEDDLE, et al., Defendants.**

No. 3:95CR736.

United States District Court,
N.D. Ohio,
Western Division.

Oct. 2, 1997.

Robert William Kern, Office of the U.S. Attorney, Cleveland, OH, Thomas A. Karol, Office of U.S. Attorney, Toledo, OH, for plaintiff United States.

Jon D. Richardson, Sr., Kaplan, Richardson, Rost & Helmick, Toledo, OH, William M. Connelly, Connelly, Soutar & Jackson, Toledo, OH, Peter R. Ginsberg, Gold & Wachtel, New York City, Robert Gold, Michael Sommer, McDermott, Will & Emery, New York City, for defendant Ronald W. Skeddle.

Ronald W. Skeddle, Perrysburg, OH, pro se.

Sheldon S. Wittenberg, Wittenberg & Phillips, Toledo, OH, Stuart G. Nash, Brendan V. Sullivan, Jr., Barry S. Simon, Marcie R. Ziegler, Williams & Connolly, Washington, DC, for defendant Darryl J. Costin.

Darryl J. Costin, Perrysburg, OH, pro se.

Jerome Phillips, Wittenberg & Phillips, Toledo, OH, Richard A. Hibey, Gordon A. Coffee, Michael K. Atkinson, Douglas N. Greensburg, Winston & Strawn, Washington, DC, for defendant Edward B Bryant.

Edward B. Bryant, Toledo, OH, pro se.

Gerald Arthur Messerman, Messerman & Messerman, Cleveland, OH, for defendant David L. Herzer.

David L. Herzer, Vermilion, OH, pro se.

Niki Z. Schwartz, Gold, Rotatori, Schwartz & Gibbons, Cleveland, OH, John E. Martindale, Martindale, Bryztwa & Quick, Cleveland, OH, for defendant Joseph G. Corsaro.

Joseph G. Corsaro, Bay Village, OH, pro se.

John J. Callahan, Toledo, OH, for defendant John R. Purser.

John R. Purser, Whitehouse, OH, pro se.

John Czarnecki, Cooper, Walinski & Cramer, Toledo, OH, for defendant Clarence H. Martin.

Clarence H. Martin, Gahanna, OH, pro se.

J. Michael Murray, Berkman, Gordon, Murray, Palda & DeVan, Cleveland, OH, John F. Potts, Toledo, OH, for defendant David M. Hobe.

David M. Hobe, Strongsville, OH, pro se.

Norman G. Zemmelman, Britz & Zemmelman, Toledo, OH, Sander Schwartz, Cook, Riley, Smith, Nance & Schwartz, Cleveland, OH, Richard G. Lillie, Lillie & Holderman, Cleveland, OH, for defendant Floyd A. Trouten, III.

Floyd A. Trouten, III, Strongsville, OH, pro se.

## Order

CARR, District Judge.

This is a criminal case in which defendants are charged with defrauding Libbey Owens Ford Co. (LOF) of millions of dollars through three self-dealing transactions. Pending is a motion by defendants Ronald W. Skeddle, Darryl J. Costin and Edward B. Bryant for an order compelling the production of LOF's entire investigative file concerning the three transactions that are the bases for this lawsuit.[1]

---

1. The government charges that the defendants defrauded LOF through three distinct schemes. The first transaction involves the outsourcing of LOF's computer department to Computer Technology Management (CTM), a company in which the defendants had an undisclosed interest. In the second transaction, defendants allegedly used rigged bids to cause LOF to sell gas wells to a company owned by defendants for a price less than market value. The final transaction at issue

. ■ As part of its case-in-chief, the prosecution called Alan Miller, General Counsel of LOF both at the time of the transactions and currently. As part of his testimony, Miller discussed certain conversations he had with other LOF officials during late April and early May, 1993, the time period during which LOF was beginning to discover and investigate the CTM, gas wells and FAS transactions. Defendants claim that Miller's direct testimony as to these conversations waives LOF's attorney-client and work product privileges as to the entire contents of its investigative file. I disagree.

■ The attorney-client privilege protects communications between an individual or an institution and its legal counsel in order to encourage clients to speak freely with their counsel. *In re Grand Jury Proceedings,* 78 F.3d 251, 254 (6th Cir.1996). Once privileged communications are disclosed by a client, or with the client's approval, however, the reason for the protection of the privilege disappears. *Id.* (finding that voluntary disclosure of privileged communications is inconsistent with an assertion of the attorney-client privilege) (*citing Westinghouse Elec. Corp. v. Republic of the Philippines,* 951 F.2d 1414, 1424 (3d Cir.1991)). Indeed, the Sixth Circuit has held that disclosure of some privileged communications waives the attorney-client privilege for all communications on the same subject matter. *In re Grand Jury Proceedings,* 78 F.3d at 255 (citations omitted).

The subject matter waiver seeks to prevent the selective, calculated disclosure of privileged communications. *See Chinnici v. Central DuPage Hosp. Assoc.,* 136 F.R.D. 464, 465 (N.D.Ill.1991) (parties cannot be allowed selectively to divulge privileged information without risking loss of privilege as to the rest of that information); *Teachers Ins. and Annuity Ass'n of America v. Shamrock Broadcasting Co.,* 521 F.Supp. 638, 641 (S.D.N.Y.1981) ("when a party discloses part of an otherwise privileged communication, he must in fairness disclose the entire communication, or at least so much of it as will make the disclosure complete and not misleadingly one-sided").

■ As I have stated in a previous order:

As a general rule, waiver of the privilege with regard to some communications waives the privilege as to all other communications relating to the "same subject matter." *In re Grand Jury Proceedings,* 78 F.3d at 255–256; *United States v. Mendelsohn,* 896 F.2d 1183, 1189 (9th Cir.1990). This rule seeks to avoid the unfairness that might result from selective disclosure while, at the same time, upholding the privilege and preserving the interests it protects from excessive exposure.

Despite the centrality of the term, "same subject matter," to this inquiry, courts have not defined its meaning and content precisely. Aside from a general instruction to construe "same subject matter" narrowly, ... no guidance has been given about how a trial court is to determine what is and what is not within the same subject matter when disclosure of some privileged communications has taken place.

Among the factors which appear to be pertinent in determining whether disclosed and undisclosed communications relate to the same subject matter are: 1) the general nature of the lawyer's assignment; 2) the extent to which the lawyer's activities in fulfilling that assignment are undifferentiated and unitary or are distinct and severable; 3) the extent to which the disclosed and undisclosed communications share, or do not share, a common nexus with a distinct activity; 4) the circumstances in and purposes for which disclosure originally was made; 5) the circumstances in and purposes for which further disclosure is sought; 6) the risks to the interests protected by the privilege if further disclosure were to occur; and 7) the prejudice which might result if disclosure were not to occur. By applying these factors, and such other factors as may appear appropriate, a court may be able to comply with the mandate that it construe "same subject matter" narrowly while accommodating fundamental fairness.

concerns an agreement entered into by LOF to lease robotics equipment from Flexible Automation Systems (FAS), whereby defendants anticipated enriching themselves at LOF's expense.

See Order Granting Intervenor LOF's Motion in Limine, filed October 1, 1997.

Defendants claim that Miller testified "extensively" as to his investigative activities before May 10, 1993, when defendants Skeddle, Costin and Bryant were suspended by LOF. In fact, Miller's testimony about his activities during this time period was quite limited. Miller stated that: 1) he sent a letter to Bryant on April 27, 1993 outlining some concerns; 2) he had a discussion with Squire, Sanders & Dempsey (SSD), outside counsel for LOF, sometime in late April; 3) he contacted Mr. Glass, LOF's outside auditor, on April 30; 4) he had a telephone conversation with Wyre and a meeting with him in early May, 1993; 5) he and others had been raising questions about how inflated they believed the FAS price to be and reacted accordingly when FAS attempted to raise the value of the robotics contract; 6) he had relayed to Glass what Wyre had told him; 7) he and other LOF officials met with LOF board members in Toledo on May 8–9; and 8) he knew nothing about CTM payments to defendants at the time that defendants were suspended. Tr. of September 25, 1997 at 639–40, 652–59, and 664–670. The majority of Miller's testimony, therefore, merely relayed the fact that certain conversations and meetings had taken place, without disclosing any of the attorney-client communications that took place during those conversations and meetings.

Miller did testify as to the content of his May 3, 1997, telephone conversation with Wyre and his follow-up meeting with Wyre in Toledo a few days later, both of which included other LOF officials. Tr. of Sept. 25, 1997 at 653–657 and 664–68. Specifically, Miller testified that, over the phone and later at their face-to-face meeting, Wyre told him about the defendants' robotics scheme, their solicitation of Wyre to participate in the robotics scheme, and the reasons for which Wyre was asked to participate in the scheme. Miller also testified that Wyre divulged that the real purchaser of the gas wells was a company owned by Skeddle and Costin and that Wyre had been participating in and receiving compensation from this secret venture. In addition, Miller stated that, during their later meeting, Wyre turned over monthly reports concerning the gas well production and a check that Wyre had received from ESMO signed by Clarence Martin.

Applying the factors I have set forth above, I find that the subject matter of Miller's limited testimony cannot be said to cover the entire investigative file of LOF. As LOF's General Counsel during the period of investigation of the three self-dealing transactions, Miller was responsible for, among other things, hiring outside counsel, interviewing involved parties, exploring the structure of the three transactions, obtaining insurance for LOF, and deciding how LOF should proceed. The handful of meetings referred to in his testimony constitute only a small portion of the activities which Miller was undertaking at the behest of LOF. These conversations and meetings are distinct, severable activities which are self-contained and unitary in focus. They do not have a common nexus with every other attorney-client communication in LOF's investigative file. To use these limited, factual disclosures as a bootstrap to discover Miller's entire investigative file would run counter to the principles underlying the narrow waiver of the attorney-client privilege recognized by the Sixth Circuit.

Furthermore, protecting the investigative file from wholesale disclosure does not prejudice the defendants. Indeed, the limited testimony as to attorney-client communications, i.e., the testimony relating to the contents of the two conversations with Wyre, was not offered to the jury for its truth, but rather only as proof of what Miller was told about the three transactions. Tr. of Sept. 25, 1997 at 665. Thus, while defendants are free to dispute whether Wyre actually uttered these words to Miller and are entitled to documents that would bear on what was said in those conversations, they cannot compel production of the remainder of LOF's investigative file.

■ Defendants also claim that the work product privilege as to all workpapers, documents, notes, memoranda and other attorney work materials prepared during LOF's investigation of defendants' schemes has been waived by Miller's testimony. I disagree.

The work product doctrine seeks to protect "the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case" without the fear that his labor will be freely available to his adversary. *United States v. Nobles,* 422 U.S. 225, 238, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1975). The work-product privilege is not coextensive with the attorney-client privilege; rather, it "is distinct from and broader. than the attorney-client privilege." *Id.* at n. 11 (citing *Hickman v. Taylor,* 329 U.S. 495, 508, 67 S.Ct. 385, 392, 91 L.Ed. 451 (1947)).

The work product privilege has been construed broadly to cover, among other things, "the tangible and intangible material which reflects an attorney's efforts at investigating and preparing a case, including one's pattern of investigation, assembling of information, determination of the relevant facts, preparation of legal theories, planning. of strategy, and recording of mental impressions." *In re Grand Jury Subpoena,* 622 F.2d 933, 935 (6th Cir.1980) (citing *Hickman,* 329 U.S. at 495, 67 S.Ct. at 385 and *Besly–Welles Corp. v. Balax, Inc.,* 43 F.R.D. 368, 372 (E.D.Wis.1968)). Additionally, opinion work product materials are more carefully protected than factual work product materials. *In re Grand Jury Proceedings,* 33 F.3d 342, 348 (4th Cir.1994); *In re Circle K Corp.,* 1997 WL 31197, *6, 1997 U.S.Dist. LEXIS 713, *18 (S.D.N.Y. Jan. 28, 1997) (affirming line of cases holding that opinion work product is to be "granted particular solicitude" and "limit[ing] the disclosure to the extent necessary to avoid unfairness").

While the work product privilege is broad, it may be waived by its holder depending upon the circumstances. *Nobles,* 422 U.S. at 239–40, 95 S.Ct. at 2170–71. Where work product materials are used testimonially, the privilege over those materials is waived. *Id.* at 240 n. 14, 95 S.Ct at 2171 n. 14 (holding that defendant's use of investigative report to refresh witness's recollection waived defendant's work product privilege as to that part of the report that related to the testimony offered).

Courts are divided, however, on the issue of whether subject matter waiver applies in the context of the work product privilege and, if it does, whether it is coextensive with subject matter waiver in the context of the attorney-client privilege. Many courts have recognized that, because the purposes behind the two rules are distinct, the same subject matter test does not apply. *See, e.g., Duplan Corp. v. Deering Milliken, Inc.,* 540 F.2d 1215, 1222–23 (4th Cir.1976); *In re United Mine Workers of America Employee Benefit Plans Litig.,* 159 F.R.D. 307, 312 (D.D.C. 1994); *Fleet Nat'l Bank v. Tonneson & Co.,* 150 F.R.D. 10, 16 (D.Mass.1993). However, others have found that, at least where testimonial use has been made of work product documents, the party claiming privilege has waived its protection as to all other work product materials on the same subject. *In re Martin Marietta Corp.,* 856 F.2d 619, 626 (4th Cir.1988); *Varel v. Banc One Capital Ptrs.,* 1997 WL 86457, *3 (N.D.Tex. Feb.25, 1997); *Alpex Computer Corp. v. Nintendo Co., Ltd.,* 1994 WL 330381, *2 (S.D.N.Y. July 11, 1994).

I need not decide whether the subject matter waiver in the work product context is coextensive with subject matter waiver in the attorney-client context, because I find that, even if the waiver is the same, the entire investigative file of LOF is not the same subject matter as the limited testimony given by Miller.

Miller's direct testimony relating to conversations he had with other LOF officials between the time LOF first came to suspect self-dealing and May 10, 1993, when LOF suspended the defendants, was arguably a testimonial use of work product materials: he disclosed some of the steps he, as LOF's counsel, took during this investigatory stage when litigation was most likely anticipated. I assume, giving defendants the benefit of the doubt, that testimonial use of work product materials constitutes a waiver of all otherwise privileged work product documents on the same subject matter.

Applying the factors I have outlined above and elsewhere, I find that the testimony by Miller did not waive LOF's work product privilege as to its entire investigative file. The conversations that Miller had with other

922

LOF officials and with outside counsel at SSD, if they are deemed to be work product materials, can certainly be severed from other work product documents prepared by Miller during his investigation. Significantly, no testimony has been given regarding such work product documents. Thus, to hold that Miller's limited disclosure of the fact that certain communications took place during late April and early May, 1993, without his divulging the contents of such communications or any work product documents prepared in connection therewith, constitutes a waiver of the entire investigative file would completely undermine the protection afforded by the work product privilege.

Most importantly, defendants will suffer no prejudice as a result of my decision to protect the contents of LOF's investigative file. The majority of Miller's testimony revealed only that conversations took place and did not discuss the content of those conversations. Moreover, the part of his testimony that discloses the contents of the two discussions with Wyre was offered not for its truth, but for the fact that the LOF board was informed of defendants' self-dealing and took action in response to it. As such, Miller's testimony is not an attempt by the government selectively to disclose some work product materials while concealing other, less favorable materials.

Miller did not testify extensively to events during LOF's investigation of the self-dealing transactions. Because his testimony was limited, both by the direct examination and by my instruction that Wyre's statements were not offered for their truth, neither the government, nor LOF acting through the government, has used their attorney-client privilege or their work product privilege as both a sword and a shield.

Accordingly, it is hereby

**ORDERED THAT** defendants' motion for an order compelling LOF to produce its entire investigative file shall be, and hereby is, denied.

**So ordered.**