AMGEN INC., Plaintiff,

v.

HOECHST MARION ROUSSEL, INC.
and Transkaryotic Therapies,
Inc., Defendants.

No. CIV.A. 97–10814–WGY.

United States District Court,
D. Massachusetts.

Jan. 18, 2000.

Michael R. Gottfried, Burns & Levinson, Boston, MA, Douglass C. Hochstetler, Edward M. O'Toole, Jane J. Choi, Michael F. Borun, Kevin M. Flowers, Marshall, O'Toole, Gerstein, Murray & Borun, Chicago, IL, Lloyd R. Day, Jr., David M. Madrid, Robert M. Galvin, Linda A. Baxley, Jennifer R. Dupre, Deborah E. Fishman, Jackie N. Nakamura, Christopher E. Stretch, Craig H. Casebeer, Day Casebeer Madrid Winters & Batchelder LLP, Cupertino, CA, Michael R. Gottfried, Dennis D. Allegretti, Richard M. Wong, Duane, Morris & Heckscher LLP, Boston, MA, for plaintiff.

Robert S. Frank, Jr., Mark A. Michelson, Choate, Hall & Stewart, Boston, MA, Peter C. McCabe, III, Raymond C. Perkins, Winston & Strawn, New York City, Steven F. Molo, Winston & Strawn, Chicago, IL, Kenneth B. Herman, Herbert F. Schwartz, James F. Haley, Jr., Russell W. Faegenburg, Fish & Neave, New York City, for defendants.

### MEMORANDUM AND ORDER

YOUNG, Chief Judge.

Amgen Inc. ("Amgen") is embroiled in complex patent litigation with Hoechst Marion Roussel, Inc. ("Hoechst") and Transkaryotic Therapies, Inc. ("Transkaryotic"). Sweeping discovery requests have been met by equally adroit countermoves. Discovery motions fall as the gentle rain. Amidst this preliminary grappling, counsel for Hoechst has made the misstep feared by all litigators, inadvertently producing to Amgen 3,821 privileged documents from the files of Hoechst attorney Maynard R. Johnston, Esq.

Hoechst, not surprisingly, wants its privileged documents back.[1] Amgen refuses.

Since I have for years taught the survey course on evidence at various of our local law schools and at continuing legal education programs, this is a matter to which I have given some thought. Here's how I formulated the rule in a 1991 lecture on evidence for Massachusetts Continuing Legal Education:

> The second aspect of the attorney-client privilege—and this applies in both federal and Massachusetts state courts—deals with inadvertent disclosure. It used to be that an inadvertent disclosure operated as a waiver of the privilege. Also, if an eavesdropper heard something, then the privilege was waived. That's gone now. If you make a mistake in your production of documents and you disclose an attorney-client communication, the other side can't use it if the disclosure was inadvertent.

William G. Young, *Reflections of a Trial Judge* 243 (MCLE, 1998). The analysis required by this actual case, however, reveals the above formulation to be overly simplistic.

### I. *Factual Background*

During June and July, 1999, five lawyers and two legal assistants at Choate, Hall & Stewart ("Choate"), one of the two law firms representing the defendants Hoechst and Transkaryotic, reviewed over 200,000 pages of documents collected from Hoechst personnel. *See* Marandett Aff. ¶ 2. The purpose of the review was to identify and withhold privileged documents while at the same time producing documents that were responsive to Amgen's document requests. *See id.* During the week of July 12 through 16, 1999, four small boxes were identified by a member of the Choate team as consisting entirely of privileged documents that had been collected from the files of Hoechst in-house counsel, Maynard R. Johnson, Esq. *See id.* at ¶ 4. These documents were segregated from responsive non-privileged documents and placed on a separate shelf in order to be withheld from production. *See id.* Yet, when Choate's outside copy vendor arrived to

---

1. More precisely, Hoechst has moved, pursuant to Fed.R.Civ.P. 37, to compel Amgen to return the documents and has requested an order prohibiting Amgen and its counsel from reading, using, disclosing, or referring to any information contained in the documents.

collect non-privileged responsive documents to be numbered and copied for production, due to an error by a paralegal working with the copy vendor, the boxes containing the privileged documents were taken from the separate shelf. *See id.* The copy vendor labeled these documents HMR532618 to 536439. *See id.* As a result of the paralegal's error, the privileged documents (some 3821 pages that filled approximately one large archive box) were included among the twenty-three archive boxes containing more than 70,000 pages that were produced to Amgen's counsel on July 16, 1999. *See id.*

On July 22, 1999, Edward M. O'Toole, counsel for Amgen, sent a letter to Choate's co-counsel Herbert F. Schwartz of Fish & Neave asking whether the documents had been produced intentionally. *See id.* at ¶ 5, Ex. A. Upon receiving the letter, Eric J. Marandett, the Choate attorney responsible for the document production, reviewed the documents identified in the letter and determined that they had been produced as a result of the paralegal's error. *See id.* at ¶ 5. Mr. Marandett then phoned Mr. O'Toole and informed him that production of the documents was not intentional and he asked Mr. O'Toole to return the documents immediately. *See id.* at ¶ 6. Also on July 22, 1999, Mr. Marandett sent a letter to Mr. O'Toole to the same effect. *See id.* at ¶ 6, Ex. B.

On July 23, 1999, Lloyd R. Day, Jr., co-counsel for Amgen, sent a letter to Mr. Marandett indicating that even though Amgen was not prepared to return the documents, Amgen's counsel would segregate the documents and refrain from reviewing them further. *See id.* at ¶ 7, Ex. C. Mr. Day requested the production of a privilege log identifying the documents and stating the basis for the claim of privilege. *See id.* at ¶ 7. Hoechst agreed to Mr. Day's request and on August 16, 1999, Hoechst provided to Amgen's counsel a comprehensive privilege log that identified each of the documents and stated the basis for the claim of privilege. *See id.* at ¶ 8, Ex. D. Finally, by letter dated October 5, 1999, Amgen counsel Robert Galvin informed Hoechst counsel Douglas Gilbert that Amgen would not return the documents. *See id.* at ¶ 10, Ex. I. Consequently,

Hoechst moves this Court to compel return of the inadvertently produced documents.

## II. *Discussion*

### A. *Standard of Review*

■ The party claiming the protection of a privilege bears the burden of demonstrating, by a fair preponderance of the evidence, not only that the privilege applies, but also that it has not been waived. *See In re Grand Jury Subpoena (Zerendow),* 925 F.Supp. 849, 855 (D.Mass.1995) (Saris, J.); *see also State ex rel. Allstate Ins. Co. v. Gaughan,* 203 W.Va. 358, 508 S.E.2d 75, 95–96 (1998) ("We further hold that the party inadvertently disclosing attorney-client privileged communication bears the burden of showing by a preponderance of evidence that the communication should retain its privileged status."). Thus, Hoechst must prove that it did not waive the privilege when its attorneys inadvertently produced the documents. Furthermore, since state law does not supply the rule of decision with respect to Amgen's claims against the defendants, federal common law governs the privilege analysis. *See* Fed.R.Evid. 501; *Texaco Puerto Rico, Inc. v. Department of Consumer Affairs,* 60 F.3d 867, 883 (1st Cir.1995).

### B. *The Attorney–Client Privilege and Work Product Doctrine*

■ The attorney-client privilege protects communications made between an attorney and a client for the sake of obtaining legal advice. *See Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981); *City of Worcester v. HCA Management Co., Inc.,* 839 F.Supp. 86, 88 (D.Mass. 1993) (Gorton, J.); *United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 358–59 (D.Mass.1950) (Wyzanski, J.). The privilege assures both attorneys and clients that discussions regarding their cases which are made in confidence will remain so. "Without this assurance, attorneys and clients might be inhibited from engaging in the free, complete and candid exchange of information that is the cornerstone of an effective attorney-client relationship." *Fleet Nat'l Bank v. Tonneson & Co.,* 150 F.R.D. 10, 13 (D.Mass. 1993) (Karol, M.J.).

■ As announced in the landmark case of *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), and ultimately codified in Federal Rule of Civil Procedure 26(b)(3), the work product doctrine protects (1) documents or other tangible things, (2) prepared in anticipation of litigation, (3) by or for a party or a party's representative. *See HCA Management*, 839 F.Supp. at 88. The underlying purpose of the work product doctrine is to protect the integrity of the adversarial process by creating a zone of privacy for those matters prepared by or for the party or the party's counsel in anticipation of litigation. *See Hickman*, 329 U.S. at 510–11, 67 S.Ct. 385; *HCA Management*, 839 F.Supp. at 88. Thus, in their distinctive manners, both the attorney-client privilege and the work product doctrine serve vital social policies.

### C. *Inadvertent Disclosure of Privileged Communications*

Although courts are consistent in lauding the social value of these privileges, they differ significantly with respect to the effect an inadvertent disclosure of privileged information has on the claim of privilege.[2] Doctrinally, the question is under what circumstances, if any, an inadvertent disclosure of privileged communications constitutes a waiver of the privilege. Courts across the country approach this question in any of three different ways.

Some courts follow the "never waived" approach, which holds that a disclosure that was merely negligent can never effect a waiver because, *a fortiori*, the holder of the privilege lacks a subjective intent to forgo protection. *See, e.g., Corey v. Norman, Hanson & DeTroy*, 742 A.2d 933, 941–42 (Me.1999);

*Helman v. Murry's Steaks, Inc.*, 728 F.Supp. 1099, 1104 (D.Del.1990); *Kansas–Nebraska Natural Gas Co., Inc. v. Marathon Oil Co.*, 109 F.R.D. 12, 21 (D.Neb.1983); *Mendenhall v. Barber–Greene Co.*, 531 F.Supp. 951, 954–55 (N.D.Ill.1982). As the *Mendenhall* court explained, "if we are serious about the attorney-client privilege and its relation to the client's welfare, we should require more than such negligence by counsel before the client can be deemed to have given up the privilege." *Mendenhall*, 531 F.Supp. at 955. No judge in this District has ever adopted this analysis.

Instead, my colleagues in the District of Massachusetts have adhered to either of two different approaches. One option has been termed the "strict accountability" rule because it effects a waiver of the privilege regardless of the privilege holder's intent or inadvertence. *See, e.g., Ares–Serono, Inc. v. Organon Int'l B.V.*, 160 F.R.D. 1, 4 (D.Mass. 1994) (Bowler, M.J.); *International Digital Systems Corp. v. Digital Equipment Corp.*, 120 F.R.D. 445, 449–50 (D.Mass.1988) (Collings, M.J.); *see also Carter v. Gibbs*, 909 F.2d 1450, 1451 (Fed.Cir.1990) (en banc); *In re Sealed Case*, 877 F.2d 976, 980 (D.C.Cir. 1989). In *International Digital Systems*, the court explained that "[w]hen confidentiality is lost through 'inadvertent' disclosure, the Court should not look at the intention of the disclosing party.... It follows that the Court should not examine the adequacy of the precautions taken to avoid 'inadvertent' disclosure either." *International Digital Systems*, 120 F.R.D. at 449–50. In reaching this conclusion, Magistrate Judge Collings reasoned that there would be "little benefit"

---

**2.** The ethical duties of an attorney who receives inadvertently-produced documents is also presently a matter of some dispute. *See* Paul D. Boynton, "MBA Panel: OK To Keep Opponent's 'Lost' Mail," 27 Mass. Law. Wkly. 2569, 2569, 2603 (1999). Relying substantially on the attorney's duty zealously to advocate for the client's interests, the Massachusetts Bar Association's Committee on Professional Ethics advised that an attorney who mistakenly received a potentially privileged letter was not ethically bound to return the letter. *See* MBA Comm. on Professional Ethics, Op. 4 (1999). The opinion was widely criticized and flew in the face of contrary

American Bar Association formal ethics opinions, which advised the recipient attorney to refrain from reading the documents and comply with any request made by the negligent attorney, including a request to return the documents, or refrain from using the documents until a court definitively resolves the proper disposition of the materials. *See* ABA Comm. on Ethics and Professional Responsibility, Formal Op. 382 (1994); ABA Comm. on Ethics and Professional Responsibility, Formal Op. 368 (1992). To its credits, Amgen followed the latter approach by segregating the documents and refraining from reviewing them further until this dispute is resolved.

in continuing to recognize a privilege which has as its foundation the principle of confidentiality when that confidentiality has already been breached. *See id.* at 449. In addition, the court pointed out that an automatic waiver rule would best encourage attorneys to safeguard their confidences from inadvertent disclosures. *See id.* at 450.

■ Apart from the "never waived" and the "strict accountability" approaches, a third option strikes a balance between these two rigid solutions. *See, e.g., Milford Power Ltd. Partnership v. New England Power Co.*, 896 F.Supp. 53, 58 (D.Mass.1995) (Gorton, J.) (considering totality of circumstances surrounding the inadvertent production of documents); *HCA Management*, 839 F.Supp. at 89 (same); *Fleet Nat'l Bank*, 150 F.R.D. at 16 (examining precautions taken to avoid inadvertent disclosure); *see also Gray v. Bicknell*, 86 F.3d 1472, 1483–84 (8th Cir.1996) (applying Missouri law which had not yet addressed the issue); *Alldread v. City of Grenada*, 988 F.2d 1425, 1434 (5th Cir.1993); *Allstate*, 203 W.Va. 358, 508 S.E.2d at 95 (adopting "middle test" for West Virginia). Massachusetts, for example, adheres to the "middle test." *See In re Reorganization of Electric Mutual Liability Ins. Co., Ltd. (Bermuda) ("EMLICO")*, 425 Mass. 419, 423, 681 N.E.2d 838 (1997) ("[A] client may be deemed to have met the burden of establishing that a privilege exists and no waiver has occurred if adequate steps have been taken to ensure a document's confidentiality.").[3] This approach empowers courts to consider a number of circumstances relating to the inadvertent production, including (1) the reasonableness of the precautions taken to prevent inadvertent disclosure, (2) the amount of time it took the producing party to recognize its error, (3) the scope of the production, (4) the extent of the inadvertent disclosure, and (5) the overriding interest of fairness and justice. *See HCA Management*, 839 F.Supp. at 89 (citing *Lois Sportswear, U.S.A., Inc. v.*

*Levi Strauss & Co.*, 104 F.R.D. 103, 105 ([S.D.N.Y.1985])). Thus, depending on the totality of these factors, the court may rule either that the inadvertent disclosure has effected a waiver of the privilege or that the privilege remains intact.

Amgen argues in its brief that the First Circuit has foreclosed further common law evolution of this issue by adopting the strict accountability approach. *See* Amgen Opp. at 5 (citing *Texaco*, 60 F.3d at 867). While the certainty and efficiency with which the First Circuit in *Texaco* dismisses the claim that the district court erred in determining that an inadvertent disclosure of documents constituted a waiver of the privilege might suggest that the First Circuit was embracing the strict accountability rule, *see Texaco*, 60 F.3d at 883, closer examination reveals that the First Circuit has adopted no particular approach. *See id.* The First Circuit explains that "[i]t is apodictic that inadvertent disclosures *may* work a waiver of the attorney-client privilege." *Id.* (emphasis added). Unlike the strict accountability rule, which rigidly requires that all inadvertent disclosures constitute a waiver, the word "may" provides for discretion. Furthermore, while the First Circuit cites the strict waiver opinion of the D.C. Circuit, *In re Sealed Case*, 877 F.2d at 979–80, it also cites two other circuit court opinions which employ the balancing language of the "middle test." *See Texaco*, 60 F.3d at 883 (citing *Alldread*, 988 F.2d at 1434; *In re Grand Jury Proceedings*, 727 F.2d 1352, 1356 ([4th Cir.1984])). In addition, the First Circuit describes the negligent conduct of the disclosing party, a description which would be unnecessary had the First Circuit adopted the strict accountability rule since the disclosing party's intent or negligence is irrelevant to the application of that rule. *See Texaco*, 60 F.3d at 883 n. 7. In light of these observations, this Court is not bound to follow the strict accountability rule.

**3.** Until the Massachusetts Supreme Judicial Court adopted the flexible "middle test" in the *EMLICO* decision in 1997, justices of the Massachusetts Superior Court had tended in recent years to follow the "never waived" approach, *see, e.g. Flynn v. Kasmet*, Norfolk Civ. No. 92–02875–B, slip op. (Mass.Super.Ct. Aug. 10, 1993) (Mulli-gan, J.) (considering all three approaches in a very clear opinion and adopting the "never waived" approach). One problem with this approach was that some justices went so far as to "suppress" data derived from privileged information inadvertently disclosed.

Having considered at length each of the three alternatives, the nature of the privileges at stake, and the consequences flowing from the adoption of each approach, this Court aligns itself with those which employ the "middle test." As the Eighth Circuit explained in *Gray,* the middle test "strikes the appropriate balance between protecting attorney-client privilege and allowing, in certain situations, the unintended release of privileged documents to waive that privilege." *Gray,* 86 F.3d at 1484. In particular, each of the two rigid alternatives fails to take highly relevant issues into account. The "never waived" approach, for example, creates little incentive for attorneys to guard privileged material closely and fails fully to recognize that even an inadvertent disclosure undermines the confidentiality which undergirds the privileges. *See id.* at 1483. Likewise, while the strict accountability rule certainly holds attorneys and clients accountable for their lack of care, it nonetheless diminishes the attorney-client relationship because, in rendering all inadvertent disclosures—no matter how slight or justifiable—waivers of the privileges, the rule further undermines the confidentiality of communications. *See id.* "If, when a document stamped 'attorney-client privileged' is inadvertently released, it and all related documents lose their privileged status, then clients will have a much greater hesitancy to fully inform their attorney." *Id.* In addition, the work product doctrine promotes the efficiency of the judicial system by protecting the confidentiality of documents which are absolutely essential in preparing a case for trial. Applying the strict accountability rule to work product would all but compel attorneys and their clients to forgo the use of these particularly valuable trial preparation documents. Providing a measure of flexibility, the "middle test" best incorporates each of these concerns and accounts for the errors that inevitably occur in modern, document-intensive litigation. *See id.* at 1484. As the Eighth Circuit concluded, "[t]he middle test provides the most thoughtful approach, leaving the trial court broad discretion as to whether waiver occurred and, if so, the scope of that waiver." *Id.* In light of the preceding considerations, the Court joins the many jurisdictions throughout the federal and state systems that have adopted the flexible "middle test."

### D. *Application of the "Middle Test"*

■ This Court thus turns to examine (1) the reasonableness of the precautions taken to prevent inadvertent disclosure, (2) the amount of time it took the producing party to recognize its error, (3) the scope of the production, (4) the extent of the inadvertent disclosure, and (5) the overriding interest of fairness and justice. *See HCA Management,* 839 F.Supp. at 89 (citing *Lois Sportswear,* 104 F.R.D. at 104). Hoechst points to its attorneys' segregation of privileged documents from responsive, non-privileged documents as evidence of "extensive precautions to prevent the disclosure of privileged information." *See* Hoechst Mem. at 4, 8–9. While such actions are surely more responsible than those employed by the disclosing party in *Texaco,* 60 F.3d at 883 n. 7, this conduct merely describes the act of document production and falls short of demonstrating precautions intended to prevent inadvertent disclosure. Although the Court recognizes that Hoechst did make some effort to prevent inadvertent disclosure by placing the boxes filled with privileged documents on a shelf separate from the documents intended to be produced, easily-accomplished additional precautions were obviously still needed. For example, particularly because Hoechst's attorneys outsourced the copying of the documents to a copy vendor, a knowledgeable attorney or legal assistant should quickly have reviewed the performance of the vendor to ensure that the proper documents were copied. The ease with which this disclosure could have been prevented informs the Court's ruling that Choate's precautions were not reasonable. In addition, the sheer magnitude of the disclosure far exceeds any inadvertent disclosure the Court has encountered in prior cases and counsels against a determination that Choate's precautions were adequate.

Moreover, it took Hoechst five days to recognize its error and then only after counsel for Amgen drew Hoechst's attention to the privileged documents. *Compare Fleet*

*Nat'l Bank*, 150 F.R.D. at 16 n. 11 (recognizing that counsel realized its mistake within a few days of its occurrence and before the inadvertently reviewed document was copied and produced to opposing counsel).

True, the Choate team reviewed over 200,000 documents and ultimately produced more than 70,000 of them. An occasional inadvertently-produced document would be more comprehensible under the circumstances of such a large production. Here the total scope of the production was necessarily broad and is but indicative of the extensive discovery required in the context of complex litigation. Yet, such a substantial release of privileged information as occurred here (approximately 200 documents comprising 3821 pages) suggests that little can be done to reverse the damage. While Hoechst is quick to point out that Amgen has suspended review of the documents until this Court issues an order, it is clear that, in addition to Mr. O'Toole, other personnel were involved in reviewing the disclosed documents. *See* Wong Dec., Ex. A; Amgen Opp. at 10. Thus, with respect to both the number of documents produced and the number of individuals who have already seen the documents, the scope of the disclosure in this case is dramatic.

Finally, the overriding interests of fairness and justice also dictate the recognition of a waiver of the privileges. While the Court is sensitive to the fact that Hoechst may be disadvantaged by the carelessness of its attorneys, it would be unjust to reward such gross negligence by providing relief from waiver. In fact, if the Court does not hold that a waiver has occurred under the egregious circumstances here presented, it might as well adopt the "never waived" rule and preclude such a holding in all cases. Hoechst's motion to compel return of inadvertently-produced documents is thus DENIED.

E. *Subject Matter Waiver*

The First Circuit stated in *Texaco*, "[i]n general, a waiver premised on inadvertent disclosure will be deemed to encompass 'all other such communications on the same subject.'" *Texaco*, 60 F.3d at 883–84 (*quoting*

*Weil v. Investment/Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 24 ([9th Cir.1981]); *see also* 6 Moore's Federal Practice, ¶ 26.49[5], at 26–175 (1999)). In light of the massive disclosure perpetrated by Choate, the rigid application of such a subject matter waiver rule effectively could force Hoechst to open its confidential files for Amgen inspection. Yet, upon close examination of Amgen's Opposition Memorandum, Amgen has not actually raised the issue of subject matter waiver. *See* Amgen Opp. at 10–11. Contrary to the language in heading IV of its memorandum, which references subject matter waiver, Amgen actually argues in that section that there are *alternative bases* to justify a determination of waiver. *See id.* (raising issues of waiver due either to prior disclosures or the advice of counsel defense to willful infringement). Amgen does not address the different, and more troubling, question of the extent to which waiver of the privileges constitutes a waiver of all such attorney-client and work product documents evidencing such subject matter. *See id.* In light of the potentially far-reaching consequences of such a holding as well as the failure on the part of Amgen to raise the issue directly, this Court expresses no opinion regarding subject matter waiver.

It is SO ORDERED.