**VLT CORPORATION and Vicor Corporation, Plaintiffs,**

v.

**UNITRODE CORPORATION, Defendant.**

No. CIV.A. 98–11152–PBS.

United States District Court,
D. Massachusetts.

May 31, 2000.

Robert E. Hillman, Lawrence K. Kolodney, Fish & Richardson, Paul F. Ware, Douglas C. Doskocil, Goodwin, Procter & Hoar, Boston, for VLT Corporation, Vicor Corporation, Plaintiffs.

William F. Lee, Hale & Dorr, Dominic E. Massa, Hale and Dorr, Wayne L. Stoner, Hale and Dorr LLP, Paul B. Galvani, Ropes & Gray, Boston, for Unitrode Corporation, Defendants.

*MEMORANDUM AND ORDER WITH
REGARD TO PLAINTIFFS' MOTION
FOR AN ORDER REQUIRING UNI-
TRODE TO RETURN INADVER-
TENTLY PRODUCED PRIVILEGED
DOCUMENTS (Docket No. 15)*

NEIMAN, United States Magistrate
Judge.

Presently before the court in this patent infringement action is a motion by VLT Corporation ("VLT") and Vicor Corporation ("Vicor") (together "Plaintiffs") requesting that Defendant Unitrode Corporation ("Unitrode") be required to destroy or return copies of two documents which, they claim, were inadvertently produced. Plaintiffs' motion was originally referred to Magistrate Judge Zachary R. Karol, who heard oral argument on May 6, 1999, but was unable to rule on the motion before his untimely death. The matter was subsequently reassigned to Chief Magistrate Judge Robert B. Collings and then to the undersigned.

This court agrees with Judge Karol's observation at oral argument that Plaintiffs' motion raises issues which are both "fascinating" and "very difficult." Fortunately, learned counsel on both sides have provided well-written briefs. In addition, this court has had the benefit of a transcript of the argument. For the reasons which follow, the court will allow the motion.

## I. *BACKGROUND*

The facts of this matter are relatively undisputed and will not be repeated in an extensive fashion. Rather, the court will summarize the issues and refer to additional facts as they become relevant to its analysis.

Plaintiffs filed this action on June 12, 1998. In apparent anticipation of extensive discovery, the parties entered into a stipulation on September 25, 1998, which, in applicable part, was designed to govern the inadvertent disclosure of work product and privileged information. The stipulation became an order of the court on October 12, 1998, when it was signed by District Judge Patti B. Saris.

In pertinent part, paragraph nineteen of the stipulation (hereinafter "the stipulated protective order") provides as follows:

Inadvertent production of documents subject to work product immunity or the attorney-client privilege shall not constitute a waiver of the immunity or privilege, *provided* that the producing party shall promptly notify the receiving party in writing of such inadvertent production after the producing party learns of such inadvertent production. If prompt notification is made and the producing party establishes the circumstances surrounding the document's inadvertent production, such inadvertently produced document and all copies thereof shall be returned to the producing party or destroyed, upon request... In [the event that the producing party seeks relief from the court], the producing party shall bear the burden of proving that the production does not constitute a waiver of the privilege or immunity.

A copy of the stipulated protective order is attached as Exhibit D to the Affidavit of Dominic E. Massa dated March 5, 1999 ("Massa Aff.") (Docket No. S–20) (emphasis in original).

Between September 28 and October 19, 1998, Plaintiffs, as part of their obligations under FED. R. CIV. P. 26(a)(1), produced approximately 25,000 pages of material. Two documents provided to Unitrode at that time are at issue here: (1) a May 1, 1995 letter from David Feigenbaum, one of Vicor's attorneys in the United States, to Mr. M. Fujimura, a Japanese "benrishi" or patent agent (hereinafter "the Feigenbaum letter"); and (2) a letter dated August 20, 1996, from Jay Prager, a senior vice-president at Vicor, to Mr. Feigenbaum; Michael Deans, Vicor's British patent agent; and Bernhard Frohwitter, Vicor's German attorney (hereinafter "the Prager letter").

Plaintiffs' counsel discovered that the two documents had been produced when they were attached to Unitrode's mediation brief in mid-December of 1998. Asserting that the letters had been produced inadvertently, Plaintiffs' counsel immediately requested that they be returned. Unitrode's attorney refused, claiming, at least initially, that the letters were sent to foreign patent agents

who were not attorneys-at-law and were therefore not privileged. "If you have information to the contrary," Unitrode's attorney stated in a letter dated December 16, 1998, "please let me know, and we can then deal with the question of whether Vicor waived any privilege that might apply." (Decl. of Lawrence K. Kolodney (Docket No. 16) (hereinafter "Kolodney Decl."), Ex. B.) In the meantime, the parties agreed to a "standstill" on any action concerning the two disputed documents.

## II. *DISCUSSION*

Despite Unitrode's narrow response when first asked to return the documents, it now makes essentially two broad arguments as to why the court should reject Plaintiffs' motion: first, that communications with non-attorney patent agents are not privileged under applicable United States law and, second, that Plaintiffs waived any claim of privilege by failing to take reasonable precautions to prevent disclosure. These two issues comprise the core of the court's discussion.

### A. *LEGAL LANDSCAPE*

■ The attorney-client privilege protects "not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn Co. v. United States,* 449 U.S. 383, 390, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). In any particular case, however, "the attorney-client privilege can stand as a major obstacle to the factfinding process." *Fleet Nat'l Bank v. Tonneson & Co.,* 150 F.R.D. 10, 13 (D.Mass. 1993) (Karol, M.J.). For example, a party may invoke the privilege "to conceal information of utmost relevance to even the most important factual issues in a case." *Id.* "Nevertheless, the privilege remains inviolate, as long as the conditions for its invocation are met." *Id.*[1]

Chief Judge William G. Young recently outlined three distinct approaches which courts have taken with respect to the conse-

quences of an inadvertent disclosure of privileged material. *See Amgen, Inc. v. Hoechst Marion Roussel, Inc.,* 190 F.R.D. 287, 290–92 (D.Mass.2000). One approach holds that inadvertent disclosure never constitutes a waiver. *See id.* at 290 (citing cases). A second approach, ascribed to by several judges in this district, holds that inadvertent disclosure always constitutes a waiver. *See id.* (citing *Ares–Serono, Inc. v. Organon Int'l B.V.,* 160 F.R.D. 1, 4 (D.Mass.1994) (Bowler, M.J.), and *International Digital Systems Corp. v. Digital Equipment Corp.,* 120 F.R.D. 445, 449–50 (D.Mass.1988) (Collings, M.J.)). A third approach, adhered to by still other judges in this district and ultimately adopted by Judge Young, holds that inadvertent disclosure only constitutes a waiver if, in view of the totality of the circumstances, adequate measures were not taken to avoid the disclosure. *See id.* at 291 (citing *Milford Power Ltd. Partnership v. New England Power Co.,* 896 F.Supp. 53, 58 (D.Mass.1995) (Gorton, J.), and *Fleet Nat'l Bank,* 150 F.R.D. at 13). Judge Young describes this third approach as the "middle test." *Id.*

Although this court would be inclined to apply the middle test to the case at bar, it does not believe that a choice among the three is necessary given one distinct feature of this particular dispute. Unlike the situation in *Amgen,* the parties here have chosen to have the issue of inadvertent disclosure governed by the stipulated protective order which provides, in applicable part, that the "[i]nadvertent production of documents subject to ... the attorney-client privilege shall not constitute a waiver of the ... privilege." Accordingly, the parties have stipulated to a rule that is close to the "no waiver" rule. This is not an uncommon occurrence. *See, e.g., Eutectic Corp. v. Metco, Inc.,* 61 F.R.D. 35, 42 (E.D.N.Y.1973) (refusing to order production where protective order provided that there would be no waiver of any privilege unless expressed in writing); *United States v. Pepper's Steel & Alloys, Inc.,* 742 F.Supp. 641, 644–45 (S.D.Fla.1990) (similar); *Prescient Partners, L.P. v. Fieldcrest Cannon,*

---

1. There also exists a "work product doctrine" which protects from disclosure documents or other tangible things prepared in anticipation of litigation by or for a party or a party's represen-

tative. *See Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). Given the nature of the disclosures here, the parties have appropriately focused on the attorney-client privilege.

*Inc.,* 1997 WL 736726, at *4 (S.D.N.Y.1997) (noting that parties drafted confidentiality agreement "to provide for the out-of-court resolution of inadvertent production issues and to avoid litigating these issues").

Now that the issue of inadvertent disclosure has been brought to its attention, the court must address three questions pursuant to the stipulated protective order: (1) whether Plaintiffs have established that there has been an "[i]nadvertent production of documents," (2) whether the documents in question "are subject to the ... attorney-client privilege," and (3) whether Plaintiffs "promptly notified [Unitrode] in writing of the inadvertent production. If all three questions are answered in the affirmative, then pursuant to the stipulated protective order Unitrode must return or destroy all copies of the documents as Plaintiffs have requested."

### B. *WAS THERE AN INADVERTENT PRODUCTION?*

■ The stipulated protective order does not define what constitutes an "inadvertent disclosure of documents." Nevertheless, in the court's opinion, Plaintiffs have established that their methodology, while leaving much to chance, resulted in the unintended rather than the purposeful or grossly negligent disclosure of two documents.[2] This contrasts with the conduct described by Judge Young in *Amgen* where two hundred privileged documents constituting thousands of pages were wrongly produced. *Amgen,* 190 F.R.D. at 292–93.

Plaintiffs' explanation of the inadvertency for their disclosure has been made more specific over the course of this dispute. Initially, Plaintiffs' attorney asserted that, "[b]efore producing the documents, [his firm] engaged in a standard screening process to eliminate privileged documents from those that would be produced to Unitrode." (Kolodey Decl. ¶ 3.) In particular, counsel explained, he instructed a knowledgeable paralegal case manager to review the responsive documents which had been collected and to remove for his review "all documents which constitute communications to, from or between Vicor, Vicor's U.S. attorneys (i.e., [Fish & Richardson]), and Vicor's foreign patent attorneys and agents." (*Id.*) When the paralegal assured counsel that all such documents had been removed, he authorized her to produce the remaining materials.

Later, when challenged by Unitrode's attorney at the hearing before Judge Karol as to how "inadvertent" the disclosure really was, Plaintiffs' counsel explained that "[t]he paralegal was not given authority to decide whether or not documents were privileged and, therefore, should be withheld from production." (Transcript Docket No. 79 (hereinafter "Tr.") at 57.) "What the paralegal was given," he stated, "was a clerical task of searching through documents with specific instructions that any documents which appeared to be communications between Vicor, and we identified specific Vicor people who would be involved in such communications, Fish & Richardson and the German, British and Japanese patent practitioners who have been involved with this patent." (Tr. at 57.) This was not a "question of judgment," counsel asserted, but "basically, a mechanical task." (*Id.* at 57–58.)

Given these explanations, the court is satisfied that Plaintiffs have adequately established that the production of the materials at issue was not a considered or grossly negligent decision, but the result of inattention, i.e., inadvertence. That being so, the court now turns to the more thorny question raised by the parties' stipulated protective order, namely, whether those documents "are subject to the ... attorney-client privilege."

### C. *ARE THE FEIGENBAUM AND PRAGER LETTERS SUBJECT TO THE ATTORNEY–CLIENT PRIVILEGE?*

Plaintiffs applied for the '146 patent on February 2, 1982, and the patent issued in

---

2. Although the stipulated protective order does not place the burden of establishing that the documents were inadvertently produced squarely on Plaintiffs, it does state that it is up to "the producing party" to "establish[ ] the circumstances surrounding the document's inadvertent production." (Massa Aff., Ex. D. ¶ 19.) This is in accord with standard practice. *See Harmony Gold USA, Inc. v. FASA Corp.,* 169 F.R.D. 113, 116 (N.D.Ill.1996) ("The party claiming inadvertent disclosure has the burden of proving that the disclosure was truly-inadvertent.")

April of 1983. Plaintiffs also own a corresponding Japanese patent for which they applied in October of 1983 and which issued in September of 1989. There also exist German and British counterparts to the '146 patent. In essence, the '146 patent and its counterparts cover a technique and specific circuit embodiments for performing an electronic function.

The Feigenbaum letter, dated May 1, 1995, sought advice from Mr. Fujimura concerning the legal significance of certain newly discovered prior art with respect to the validity of the Japanese counterpart to the '146 patent. Mr. Fujimura is a "benrishi," a specialized Japanese legal practitioner, but not an attorney-at-law. (*See* Kolodney Decl., Exs. H and I.) In relevant part, the Feigenbaum letter states as follows:

> Some issues have arisen with respect to prior art that may impact both the United States patent and the Japanese patent. We are dealing with the United States issues, but we believe that law is possibly different in Japan with respect to the impact of the prior art on the Japanese patent. We need a careful analysis and advice from you.

(Massa Aff., Ex. A.). In particular, the letter refers, among other things, to a 1981 article which "describes a technique, and certain circuit embodiments, which are essentially identical to those described in my client's patents." (*Id.* at 2.)

Like the Feigenbaum letter, the Prager letter, dated August 20, 1996, concerns the significance of potential prior art. The letter, authored by Jay Prager, a senior vice-president of Vicor, was addressed to Mssrs. Feigenbaum, Deans and Frohwitter. At the time of the letter, Mr. Deans, a British patent agent, represented Vicor in an amendment proceeding before the British patent office relating to the British counterpart of the '146 patent, Mr. Frohwitter, a German attorney, represented Vicor in patent infringement litigation in Germany concerning the German counterpart of the '146 patent, and Mr. Feigenbaum, a United States attorney, represented Vicor before the United States Patent and Trademark Office in con-

nection with a reissue concerning the '146 patent.

In his letter, Mr. Prager requested advice from the three recipients about the legal significance of a potential prior art reference, asking the following question in particular: "Given that this patent was filed in Germany in Oct. '81, four months before our patent was filed, and filed in the U.S. in Sept. '82, can this [prior] art be cited to try to make an 'obviousness' argument?" (Massa Aff., Ex. B.) Plaintiffs admit that the Prager letter does not specify whether the request concerning "this patent" applies to the '146 patent or its German or British counterparts. Plaintiffs, however, argue that the letter was directed at all three, each patent being simultaneously in play in proceedings in its home country. For his part, Prager attests that he "expected each [recipient] to provide [him] with legal advice in their respective areas of expertise (i.e., Feigenbaum concerning U.S. patent law, Mr. Deans, concerning British patent law, and Mr. Frohwitter concerning German patent law)." (Decl. of Jay Prager (Docket No. 27) ¶ 3.)

### 1. *Preliminary Matters*

Prior to addressing the heart of the privilege issue, the court finds it necessary to make three initial observations.

First, the parties appear to raise a materiality issue. Plaintiffs describe the Feigenbaum and Prager letters as having "marginal relevance" to Unitrode's defense, while Unitrode describes the letters as making significant "admissions" about prior art in direct contravention of positions taken by Plaintiffs not only in this litigation but before the United States Patent and Trademark Office as well. Unitrode's description notwithstanding, the court does not believe that any purported "admission" with respect to a patent should determine the privileged nature of a document unless, of course, the admission amounts to a crime or fraud on the Patent and Trademark Office. *See In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 807 (Fed.Cir.2000). Moreover, although Unitrode notes that there may be a question as to whether the crime-fraud exception to the attorney-client privilege might apply, it admits that the court "need not reach the is-

sue." (Def.'s Opp. (Document No. 20) at 14 n. 4.) The argument not being pressed, the court does not address the matter further.

Second, Plaintiffs candidly acknowledged at oral argument that neither the Feigenbaum nor the Prager letter sought to have foreign patent agents act under the authority of a United States attorney. Were such agency involved, Plaintiffs might have argued that the documents are privileged under federal common law. *See Mitts & Merrill, Inc. v. Shred Pax Corp.*, 112 F.R.D. 349, 352 (N.D.Ill., 1986). The Prager letter, however, was a communication from Vicor itself, not its attorney, and the Feigenbaum letter, Plaintiffs concede, reflected a request for advice from a foreign patent agent by an American attorney, but did not direct that agent to do any particular act on the American attorney's behalf.

Third, unlike the inadvertent disclosure issue, there appears to be no First Circuit or District of Massachusetts decision which addresses whether foreign patent agents are subject to the attorney-client privilege under federal common law. The Federal Circuit, in an unpublished opinion, recently declined to address the issue with respect to French patent agents. *See McClarin Plastics, Inc. v. LRV Acquisition Corp.*, 1999 WL 507188, at \*4 (Fed.Cir. July 12, 1999). *But see Bristol–Myers Squibb Co. v. Rhone–Poulenc Rorer, Inc.*, 188 F.R.D. 189, 201 (S.D.N.Y.1999) (French patent agents' communications not privileged unless agents were acting under authority of an American patent attorney). Accordingly, the court is writing on a clean slate in this district.

### 2. *Choice of Law and Determination of Privilege*

■ In asserting the non-applicability of the attorney-client privilege to the two letters at issue, Unitrode concedes and Plaintiffs appear to agree that the court must first undertake a choice of law analysis. In this regard, the parties both cite *Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514 (S.D.N.Y.1992), which recognized the principle of international comity to analyze communications with foreign patent agents. The *Golden Trade* approach admittedly contrasts

with a bright line rule articulated in earlier cases from the Southern District of New York which refused to recognize the attorney-client privilege for foreign patent agents under any circumstances. *See id.* at 519 (citing cases).

*Golden Trade* was a patent infringement suit in which the defendants sought production of communications between an Italian corporation and patent agents it retained to prosecute patent applications in several foreign countries. In deciding the attorney-client privilege issue, the court found that it first had to address the "crucial" questions of "whether an American court may ever apply foreign privilege law to determine whether communications with a patent agent should be protected and, if so, in what circumstances." *Id.* at 519. These issues were significant, the court stated, "because many foreign countries treat their patent agents as the functional equivalent of an attorney and recognize what amounts to an attorney-client privilege for [their] communications with [their] clients." *Id.*

This court will not repeat the detailed analysis undertaken in *Golden Trade* other than to note that the court there found that the choice of law question fell under FED. R. EVID. 501. That rule of evidence provides that questions of privilege "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." The purpose of Rule 501 "was to 'provide the courts with the flexibility to develop rules of privilege on a case by case basis.'" *Trammel v. United States*, 445 U.S. 40, 47, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980) (quoting 120 Cong. Rec. 40891 (1974) (statement of Rep. Hungate)). Although, as the *Golden Trade* court explained, "this flexibility is most commonly invoked to determine whether to recognize new forms of privilege, or to disestablish previously recognized ones, it has also been utilized to look to the law of other jurisdictions as guides when those jurisdictions have a strong interest in the rela-

tionship at issue." *Golden Trade*, 143 F.R.D. at 521 (citations and internal quotation marks omitted).[3]

The choice of law analysis cited in *Golden Trade*—the "working standard"—is as follows:

> "[A]ny communications touching base with the United States will be governed by the federal discovery rules while any communications related to matters solely involving [a foreign country] will be provided by the applicable foreign statute." ... [C]ommunications by a foreign client with foreign patent agents "relating to assistance in prosecuting patent applications in the United States" are governed by American privilege law whereas communications "relating to assistance in prosecuting patent applications in their own foreign country" or "rendering legal advice ... on the patent law of their own country" are, as a matter of comity, governed by the privilege "law of the foreign country in which the patent application is filed," even if the client is a party to an American lawsuit.

*Id.* at 520 (quoting *Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp. 1146, 1169–71 (D.S.C.1974)). In light of this standard, the parties to the present matter apparently agree that the privilege issue is to be determined with reference to foreign law if the communication has nothing to do with the United States. If in such instances there is no privilege under foreign law, there is no privilege here. Unfortunately, the parties immediately part company when it comes to further interpreting the phrase "touching base with the United States."

Unitrode argues that the phrase should be interpreted strictly. Thus, even a minimal amount of contact with the United States would preclude the application of foreign law to the question of privilege. *See Odone v. Croda Int'l PLC*, 950 F.Supp. 10, 13–14 (D.D.C.1997) (United States privilege law applies to communications between a foreign country and a foreign patent agent because communications addressed whether a United States resident should be named as an inventor of the foreign patent). For foreign privilege law to apply, Unitrode emphasizes, the communication must relate "solely" to foreign patent matters. In the present matter, Unitrode asserts, both letters, at least in part, concern activities related to the United States and, therefore, the federal discovery rules apply.

Plaintiffs, in counterpoint, argue that the "touching base" test ought not turn on the content of a communication, but its overall purpose. Thus, a court should consider privileged all communications that are directed at foreign patent practitioners for the purpose of obtaining legal advice concerning foreign patent law. In support, Plaintiffs cite *Heidelberg Harris, Inc. v. Mitsubishi Heavy Indus., Ltd.*, 1996 WL 732522, at *8 (N.D.Ill. 1996), *Burroughs Wellcome Co. v. Barr Lab., Inc.*, 143 F.R.D. 611, 616–17 (E.D.N.C.1992), and *Mendenhall v. Barber–Greene Co.*, 531 F.Supp. 951, 953–54 (N.D.Ill.1982).

In the court's opinion, the standard proffered by Unitrode is too rigid. Were it applied, a document could touch base with the United States if it merely emanated here. As a result, a United States domiciliary could hardly engage in privileged communications with foreign patent agents. Similarly, the mere mention of a United States patent in a communication could cause a communication to be non-privileged, even if the mention is incidental to the foreign inquiry. On the other hand, Plaintiffs' formulation could cut too wide a swathe, protecting all references to United States patents merely because the communication has as its primary purpose

---

3. In this court's opinion, "other" jurisdictions include foreign jurisdictions. *See* Christopher F. Dugan, *Foreign Privileges in U.S. Litigation*, 5 J. INT'L L. & PRAC., 33, 44 (1996) ("International law is part of the federal common law, and it should be considered by courts engaging in privilege analysis under FED. R. EVID. 501."). In fact, the parties themselves agree that foreign privilege law may be utilized if the choice of law analysis calls for its application. *See also* Kurt Reichenberg, *The Recognition of Foreign Privileges in United States Discovery*, 9 NW. J. INT'L L. & BUS. 80, 136 (1988) (by giving serious consideration to foreign privileges, United States courts will "obtain increasing acceptance of their discovery orders relating to foreign parties or witnesses and diminish perceptions of United States 'insensitivity to the interests safeguarded by foreign legal regimes' ") (quoting *Societe Nationale Industrielle Aerospatiale v. United States Dist. Court for the So. Dist. of Iowa*, 482 U.S. 522, 567–68, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987) (Blackmun, J., dissenting)).

the need to obtain legal advice concerning foreign patents and applicable foreign law.

In the court's view, a reference to a United States patent that is more than incidental should be governed by a traditional choice of law analysis, that is, looking to the laws of the country with the most direct and compelling interest in the reference. In reaching this conclusion, the court has considered two things in particular.

First, although *Golden Trade* quotes a somewhat rigid choice of law analysis from *Duplan,* the court actually engages in a traditional balancing test and considers the subject matter at issue, the parties to the communication and whether those entities are parties to the lawsuit. With such factors in mind, the *Golden Trade* court focuses on those countries which have "the dominant interest in" the issue and concludes that it should, "as a matter of comity, look to the law of those jurisdictions unless that law is clearly inconsistent with important policies embodied in federal law." *Id.,* 143 F.R.D. at 520–21. To be sure, the court, in reaching its conclusion, "reiterate[s] that federal law controls the determination of privilege issues under Rule 501." Even so, the court finds "no reason . . . to read this rule as referring solely to substantive federal common law as distinguished from such choice-of-law rules as may otherwise be applicable" or "as inflexibly precluding a federal court from looking to the substantive law of jurisdictions that, by virtue of the circumstances in which the disputed communication was made, have the *most direct and compelling interest* in whether those communications are to be publicly disclosed." *Id.* at 521 (emphasis added). Thus, although *Golden Trade* mentions the "touching base" approach in *Duplan*—a case decided before the enactment of Rule 501—it utilizes a choice of law analysis that looks to the sovereign with the "most direct and compelling interest."

Second, the "most direct and compelling interest" approach is akin to that taken by the RESTATEMENT (SECOND) OF CONFLICT OF LAWS (1988 Rev.). Section 139(2) thereof suggests that, when the sovereign with the "most significant relationship with the communication" recognizes a privilege not recognized in the forum state, the communication should be disclosed under the policy of the forum state unless the foreign state's interest overrides. Massachusetts courts, when appropriate, have adopted the "choice-influencing considerations" of the Second Restatement. *Cosme v. Whitin Mach. Works, Inc.,* 417 Mass. 643, 632 N.E.2d 832, 834 (1994); *Bushkin Associates, Inc. v. Raytheon Co.,* 393 Mass. 622, 473 N.E.2d 662, 668 (1985).[4]

■ The court will apply the "touching base" test as follows. If, as the parties appear to agree, a communication has nothing to do with the United States or, in the court's view, only an incidental connection to this country, the privilege issue will be determined by the law of the foreign nation. If, however, the communication has more than an incidental connection to the United States, the court will undertake a more traditional analysis and defer to the law of privilege of the nation having the most direct and compelling interest in the communication or, at least, that part of the communication which mentions the United States. Such interest will be determined after considering the parties to and the substance of the communication, the place where the relationship was centered at the time of the communication, the needs of the international system, and whether the application of foreign privilege law would be "clearly inconsistent with important policies embedded in federal law." *Golden Trade,* 143 F.R.D. at 521. With these standards in mind, the court examines each of the letters at issue here.

---

**4.** It should be noted that several other approaches to the choice of law analysis have been suggested, including a "territorial" analysis, Steven Bradford, *Conflict of Laws and the Attorney–Client Privilege: A Territorial Solution,* 52 U. PITT. L. REV. (1991), several "functional" analyses, Roger J. Goebel, *Professional Qualification and Educational Requirements for Law Practice in a Foreign Country: Bridging the Cultural Gap,* 63 TUL. L. REV. 443, 505–06 (1989), and Virginia J. Harnisch, *Confidential Communications Between Clients and Patent Agents: Are They Protected Under the Attorney–Client Privilege?,* 16 HASTINGS COMM. & ENT. L.J. 433, 447 (1994), and a "better law" approach, Holly Sprague, Note, *Choice of Law: A Fond Farewell to Comity and Public Policy,* 74 CAL. L. REV. 1447 (1986).

### a. The Feigenbaum Letter

■ In the court's opinion, the reference in the Feigenbaum letter to a United States patent is incidental to the inquiry and hardly amounts to a justification for the application of anything but Japanese law on privilege. However, even were the court to consider such reference as more than incidental, Japan still has the most direct and compelling interest in the Feigenbaum letter. The letter is clearly limited to Japanese legal issues. After Mr. Feigenbaum, a United States attorney, explains that he will be dealing with "some issues with respect to prior art" as it affects the patent in the United States, he asks Mr. Fujimura, a Japanese benrishi, for "careful analysis and advice" with respect to "the impact of the prior art on the Japanese patent." That, and not an interpretation of a United States patent, is the clear intent of the letter.

■ Unitrode argues, however, that even were the court to conclude, as it does, that Japanese law should govern the question of privilege, Plaintiffs cannot prove that benrishi are deserving of attorney-client protection under Japanese law. As indicated, benrishi are not attorneys-at-law, although the English translation is that of "patent attorney." (Kolodney Decl., Exs. H and I.) A "bengoshi," in contrast, is akin to an English barrister and engages in litigation. *See* Constance O'Keefe, *Symposium: Winds of Change—A Global Look at Legal Education: Legal Education in Japan,* 72 OR. L. REV. 1009 (1993).

Unitrode's arguments to the contrary, the court believes that Japanese law would treat the Feigenbaum letter as privileged. Benrishi, after all, may appear before the Japanese patent office, offer legal advice concerning infringement and validity issues under Japanese patent law, send warning letters to potential infringers, and appear on behalf of clients in certain court proceedings relating to patents. (*See* Kolodney Decl., Ex. I.) Article 197 of the Japanese Civil Procedure

Code, effective January 1, 1998, treats as privileged information learned by benrishi from clients in the same manner as bengoshi. In particular, paragraph 1 item (2) of Article 197 provides that "[w]here a witness who is or was a ... lawyer (including a ... [b]engoshi), [or a] patent attorney [benrishi], ... is questioned with regard to [a] fact which he has obtained knowledge in the exercise of his professional duties and he should keep secret," that witness has a testimonial privilege. (*See* Kolodney Decl., Ex. J.) The former Article 281 of the Japanese Civil Procedure Code provided substantially the same privilege to communications with benrishi. (*See* Kolodney Decl., Ex. K.)

In addition, prior to January 1, 1998, documents held by parties in litigation were not generally subject to mandatory production under Article 312 of the Japanese Code, except in three instances not applicable here. (*See id.*) Effective January 1, 1998, the code was amended to allow for liberal American-style discovery. *See* Glenn Theodore Melchinger, *For the Collective Benefit: Why Japan's New Strict Product Liability Law is "Strictly Business,"* 19 U. HAW. L. REV. 879, 939 (1997). Specifically, Article 312, renumbered 220, created a catch-all category of documents that a party could not refuse to produce. (*See* Kolodney Decl., Ex. J.) However, even under the new discovery rules, documents reflecting communications between clients and benrishi are exempt from production. (*See id.,* Art. 220(4)(b)).[5]

Finally, the court does not consider the privileged nature of the Feigenbaum letter under the Japanese Code to be "clearly inconsistent with important policies embodied in federal law." This conclusion relates, in part, to Plaintiffs' fall-back argument, namely, that even were United States law to apply to the Feigenbaum letter, the document should be withheld as privileged. Plaintiffs argue that benrishi are, in effect, attorneys with whom communications are confidential, even though they, unlike bengoshi, are not

---

**5.** Although Unitrode argues that, at best, the Japanese Code simply gives benrishi the right to refuse to testify, *see Alpex Computer Corp. v. Nintendo Co., Ltd.,* 1992 WL 51534 (S.D.N.Y. March 10, 1992), it is apparent to the court that

that right arises out of an implied, if not, an actual privilege. Indeed, the same code section mentioning benrishi includes doctor-patient and clergy-penitent communications.

considered attorneys under United States law. (*See* Kolodney Decl. ¶¶ 14, 15.) In particular, benrishi are authorized to give expert opinions to clients with respect to the interpretation of the scope of patents, (*see id.*, Ex. I at 3), which was precisely what was asked of Mr. Fujimora.

Although Unitrode points to numerous cases which hold that benrishi, as mere patent agents, are not deemed attorneys under United States law, *see Detection Systems, Inc. v. Pittway Corp.*, 96 F.R.D. 152 (W.D.N.Y.1982); *Alpex Computer Corp. v. Nintendo Co.*, 1992 WL 51534 (S.D.N.Y. 1992); *Santrade, Ltd. v. Gen. Elec., Co.*, 150 F.R.D. 539 (E.D.N.C.1993); *see also Glaxo, Inc. v. Novopharm Ltd.*, 148 F.R.D. 535, 539 (E.D.N.C.1993), the court believes that Plaintiffs' fall-back argument has merit. Nevertheless, the court finds it unnecessary to decide whether or not United States law on privilege would accord communication with benrishi the same protections accorded attorneys in this country. It is enough, in the court's estimation, that Plaintiffs have adequately demonstrated that the application of Japanese privilege law to the Feigenbaum letter, albeit addressed to a benrishi, would not be "clearly inconsistent with important policies embodied in federal law." *Golden Trade*, 143 F.R.D. at 521.

As the Supreme Court stated in *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), the attorney-client privilege serves the important purpose of encouraging "full and frank communication between attorneys and their clients and thereby promote[s] broader public interests in the observance of law and administration of justice." *See also Trammel*, 445 U.S. at 51, 100 S.Ct. 906 (the attorney-client privileges is "rooted in the imperative need for confidence and trust"). While this particular goal may be achieved within the United States by limiting the privilege to communications with attorneys-at-law, the same cannot necessarily be said for Japan. *See*

Daiske Yoshida, Note, *The Applicability of the Attorney–Client Privilege to Communications with Foreign Legal Professionals*, 66 FORDHAM L. REV. 209, 211 n. 16 (1997). Strictly limiting recognition of the privilege to the small number of fully licensed bengoshi would remove the privilege from most communications which seek professional legal advice about Japanese patents, those directed toward benrishi.

### b. The Prager Letter

■ Unitrode does not appear to contest the application of the attorney-client privilege to those parts of the Prager letter which might be deemed addressed to Feigenbaum or Frohwitter, both of whom are attorneys. Unitrode asserts, however, that the advice sought from Deans presents a significantly different question: whether the letter, insofar as it is directed to a registered British "patent agent," is nonetheless protected by the attorney-client privilege. To answer this question, the court finds it necessary to undertake the choice of law analysis described above because the letter makes more than an incidental reference to a United States patent. In the court's opinion, as described below, the United Kingdom has the more direct and compelling interest in the pertinent communication contained in the Prager letter.

The court first makes one observation about the substance of the Prager letter. It is uncontested that the reference in the Prager letter to "this patent" signifies a German counterpart to United States Patent No. 4,443,840 (hereinafter the "'840 patent"), even though the '840 patent itself was attached to the Pager letter. The "German patent" was filed in October of 1981, several months before the filing of the '146 patent, therefore potentially putting it in the legal category of "prior art." Thus, Prager asks Deans whether the German patent "can ... be cited to try to make an 'obviousness' argument." [6]

---

**6.** The court was initially somewhat confused by the Prager letter to the extent it referred to the German counterpart of the '840 United States patent but actually attached a copy of the '840 patent itself. The '840 patent, however, was filed in September of 1982, well *after* the '146 patent

was filed in the United States and could not raise a prior art issue. *But see* 35 U.S.C. § 119(a) (indicating that a United States patent such as the '840 patent may be entitled to the benefit of the priority date of an earlier filed foreign patent). The court's initial confusion was not

Now to the choice of law issue. Deans understood the Prager letter as requesting advice concerning "the significance of the German patent for the validity of [the British counterpart to the '146] patent under European (and specifically British) laws" and he responded in kind. (Docket No. 28 ¶¶ 4 and 5.) Deans specifically avows that his response was "from a British viewpoint," (Docket No. 27 ¶ 4), and that his advice might not apply in either Germany or the United States, (Docket No. 28 ¶ 5). The communication to Deans, therefore, concerned British patent law and the amendment proceeding before the British patent office concerning the British counterpart to the '146 patent. Thus, it was British, not United States law, at issue. *Contrast Glaxo*, 148 F.R.D. at 539 (communication from British patent agent to American lawyer concerning question of United States law). Accordingly, the United Kingdom has the most direct and compelling interest and British law on privilege should apply.

■ Although Deans is a "patent agent" only, his communications with his clients concerning patent matters are entitled to the same privileges under British law as are the communications of a solicitor. *See* 33 HALSBURY'S STATUTES OF ENGLAND AND WALES § 280 (4th ed. 1997) (Kolodney Decl., Ex. O.)[7] Communications with solicitors, in turn, are privileged to the same extent as they are under United States law:

> A solicitor cannot be compelled to disclose communications, whether oral or written, passing directly or indirectly between him and his client, or between him and a person who is communicating with him professionally with a view to becoming his client, for the purpose of giving or receiving legal professional advice if they are legitimate communications in the sense that they are not made in furtherance of fraud or crime.... The effect of the privilege is that neither the client, nor the solicitor without his consent, can be compelled to

disclose the communications in the course of legal proceedings.

44(1) HALSBURY'S LAWS OF ENGLAND § 90 (4th ed. 1995) (Kolodney Decl., Ex. N; *see also* Kolodney Decl., Ex. G.) United States courts generally have recognized the privilege under the principle of comity. *See Stryker Corp. v. Intermedics Orthopedics, Inc.*, 145 F.R.D. 298, 306–307 (E.D.N.Y. 1992); *Mendenhall*, 531 F.Supp. at 954; *Willemijn Houdstermaatschaapij BV v. Apollo Computer, Inc.*, 707 F.Supp. 1429, 1445 (D.Del.1989). *See also* Yoshida, 66 FORDHAM L. REV. at 224. Recognizing that privilege in the circumstances presented here, the court concludes that the Prager letter is protected from disclosure.

### D. DID PLAINTIFFS PROMPTLY NOTIFY UNITRODE?

Having determined that Plaintiffs have established that there was an "[i]nadvertent production of documents" and that the documents in question "are subject to the ... attorney-client privilege," the court turns to the final issue raised by paragraph nineteen of the stipulated protective order, namely whether Plaintiffs "promptly notified [Unitrode] in writing of the inadvertent production." The answer to that question is yes. Indeed, in a letter to Plaintiffs' counsel on December 16, 1998, Unitrode's attorney did not dispute the timeliness of Plaintiffs' notification. Accordingly, Plaintiffs have met all applicable conditions of the stipulated protective order and the Feigenbaum and Prager letters and all copies thereof should be returned to Plaintiffs or destroyed.

### III. CONCLUSION

It is unfortunate that an inadvertence stalled the early stages of this case for so long. For now, however, for the reasons stated, the court hereby ALLOWS Plaintiffs'

---

helped by the declarations of Mr. Deans and Mr. Prager, each of whom wrongly stated that the Prager letter "included a copy of [the] German patent." (*See* Decl. of Jay Prager (Docket No. 27) ¶ 2; Decl. of Michael J.P. Deans (Docket No. 28) ¶ 2.)

7. In any event, Deans avers that British Patent agents are now called "Patent Attorney[s]" and that he is listed in the European Patent Institute "as a European Patent Attorney." (Docket No. 28 ¶ 1.)

**20**

motion to require Unitrode to return the two documents inadvertently produced.

IT IS SO ORDERED.